IN THE SUPREME COURT OF NORTH CAROLINA

No. 278PA17

Filed 26 October 2018

STATE OF NORTH CAROLINA

v.

JOHN ANDREW MADDUX

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous, unpublished decision of the Court of Appeals, ___ N.C. App. ___, 803 S.E.2d 463 (2017), finding plain error in judgments entered on 20 April 2016 by Judge C. Winston Gilchrist in Superior Court, Johnston County, and granting defendant a new trial. Heard in the Supreme Court on 29 August 2018.

*Joshua H. Stein, Attorney General, by Joseph L. Hyde, Assistant Attorney General, for the State-appellant.*

*Anne Bleyman for defendant-appellee.*

HUDSON, Justice.

This case comes to us by way of the State's petition for discretionary review of the opinion of the Court of Appeals. Specifically, the State has asked us to determine whether the Court of Appeals erred in awarding defendant a new trial because of plain error in a jury instruction on aiding and abetting. We agree that the trial court erred in giving the aiding and abetting instruction; however, because the Court of

Appeals incorrectly concluded that the trial court's error amounted to plain error, we reverse the decision of the Court of Appeals.

## I.     Factual and Procedural Background

This case began with two searches of defendant's residence by the Johnston County Sheriff's Office Narcotics Division on 19 August 2015. On that date, two detectives responded to a complaint that drug activity was occurring at defendant's home. When they arrived at the house, defendant answered the door, identified himself as the owner of the property, and consented to a search of his residence.

During the first search, the two detectives walked through the interior of the home. Defendant first took the detectives to his master bedroom and adjoining master bathroom, where they found no evidence of drug activity. Then defendant took the detectives to the bedroom of one of his sons, where they found on the floor a clear baggie containing four white pills and a homemade bong. Upon finding these things, detectives asked defendant whether any methamphetamine manufacturing items or paraphernalia were in the home. Defendant responded in the negative but added that his stepson Lyn Sawyer (Sawyer), who occasionally spent the night on defendant's couch, was on probation for manufacturing methamphetamine in South Carolina.[1]

---

[1] Detectives would later find mail addressed to Sawyer in defendant's residence.

Next, the detectives' search took them to the outside of defendant's residence, where they found a one-pot meth lab[2] inside a burn barrel.[3] The one-pot meth lab and burn barrel were located approximately thirty yards behind defendant's home, and they were accessible to neighboring properties. Upon finding the burn barrel, the two detectives turned the investigation over to another detective, who carried out his own search of defendant's residence and conducted a more general investigation.

The other detective's search of defendant's residence revealed the following items that are commonly used in methamphetamine production: (1) in defendant's master bedroom, an empty package of lithium batteries, a metal strainer, a glass measuring cup, the top portion of a plastic bottle containing a white residue,[4] a Walgreens receipt for pseudoephedrine,[5] and a plastic tube located inside a plastic tote bag sitting by defendant's bed; (2) in defendant's master bathroom, an open box

---

[2] The one-pot meth lab is one of a number of methods that methamphetamine producers use to cook meth. The process involves placing the ingredients, including ammonium nitrate, into a plastic bottle and shaking the bottle to produce an ammonia gas reaction. As the ammonia gas is produced, the person cooking the meth alternatively shakes the bottle and partially opens the cap to release the pressure building inside the bottle. The result of this process is that the pseudoephedrine inside the bottle will convert into methamphetamine. After the pseudoephedrine converts into methamphetamine, a separate process is used to change the methamphetamine into a powdery substance. That powdery substance is then filtered through strainers and coffee filters.

[3] A burn barrel houses a burn pile, which is a commonly used method by methamphetamine producers to destroy the evidence of methamphetamine production.

[4] This residue was not chemically analyzed.

[5] Pseudoephedrine is an immediate precursor chemical to the manufacture of methamphetamine under N.C.G.S. § 90-95(d2)(37)(2017).

of instant cold packs,[6] a clear plastic baggie containing a white powdered substance that appeared to be methamphetamine,[7] and a trash bag containing balled-up, burnt strips of aluminum foil that were consistent with meth boats used to smoke methamphetamine; and (3) in defendant's kitchen, a can of acetone[8] that was either nearly or completely empty, a water bladder from an instant cold pack,[9] and more meth boats inside a diaper box.

When the other detective searched the burn barrel in defendant's back yard, he found two two-liter plastic bottles that the North Carolina State Crime Laboratory would later determine contained methamphetamine and pseudoephedrine, along with coffee filters, a latex glove, trash bags, paper towels, and battery casings that apparently had been pried open.[10]

After searching the burn barrel, the detective continued to walk around the exterior premises of defendant's residence, during which he was approached by defendant's neighbor. After briefly speaking with the neighbor, the detective decided

---

[6] The specific brand of instant cold packs found in defendant's bathroom contains ammonium nitrate, which is an essential element in manufacturing methamphetamine.

[7] This powdered substance was not chemically analyzed.

[8] Acetone is an immediate precursor chemical to the manufacture of methamphetamine under N.C.G.S. § 90-95(d2)(2)(2017).

[9] In the process of cooking methamphetamine, producers separate the water bladder from the ammonium nitrate contained in the cold pack and discard the water bladder.

[10] Methamphetamine producers pry open casings for AA lithium batteries to access the lithium strips that are used in methamphetamine production. It is unclear whether the battery casing recovered from the burn barrel belonged to a AA lithium battery.

to search the neighbor's residence also. Before searching the house, the detective learned that the neighbor shared her house with her daughter, Alex Tucker (Tucker), and Sawyer, defendant's stepson. After receiving consent from Tucker to search her room, the detective found a pink bag containing materials that he identified as methamphetamine components.

Also, while the detective was at the neighbor's residence, a child informed him that Sawyer had run out of the back door when the detective approached the residence. Although Sawyer would not return to the neighbor's residence, the detective spoke with him over the telephone. Sawyer said he was scared to return because he was on probation, and he was afraid the detective would arrest him for manufacturing meth.

Next, the detective spoke with defendant, who stated that: (1) "Sawyer was a liar"; (2) Sawyer possibly cooked meth with Tucker next door; (3) Sawyer talked about cooking meth all the time; and (4) defendant had once tried meth but did not like it.

On 5 October 2015, defendant was indicted for manufacturing methamphetamine, possession of a methamphetamine precursor, and felony conspiracy to manufacture methamphetamine. On 2 November 2015, defendant was further indicted for two counts of trafficking in methamphetamine by manufacture and one count of conspiring to traffic in methamphetamine. Later, on 7 March 2016, the second indictment was replaced by a superseding indictment charging trafficking

in methamphetamine by manufacture, trafficking in methamphetamine by possession, and conspiracy to traffic in methamphetamine.

Defendant's trial began on 18 April 2016, and the State presented the above evidence through the testimonies of (1) the detectives who conducted the 19 August 2015 searches and interviews, (2) an agent with the State Bureau of Investigation who entered defendant's home and processed the items related to the one-pot meth lab and those found in the burn barrel located on defendant's property, and (3) a drug chemist at the North Carolina State Crime Laboratory who analyzed the contents of plastic bottles contained in the one-pot meth lab and burn-barrel.

At the close of the State's evidence, defendant moved to dismiss all charges. The State voluntarily dismissed the two conspiracy charges, and the trial court granted defendant's motion to dismiss as to the charge of possession of an immediate precursor; however, the court denied the motion as to the rest of the charges. Defendant offered no evidence at trial.

At the close of all evidence, the trial court instructed the jury that defendant could be found guilty of manufacturing methamphetamine, trafficking in methamphetamine by manufacture, and trafficking in methamphetamine by possession either through a theory of individual guilt or of aiding and abetting. Defendant did not object to these instructions.

The jury convicted defendant of the following charges by means of a general verdict sheet: (1) manufacturing methamphetamine, (2) trafficking in methamphetamine by manufacture, and (3) trafficking in methamphetamine by possession. Because there was no special verdict sheet, the record does not reflect whether the jury convicted defendant based on individual guilt or a theory of aiding and abetting. Defendant appealed his convictions to the Court of Appeals.

The Court of Appeals announced two holdings pertinent to this appeal. First, the Court of Appeals determined that the trial court erred in giving an aiding and abetting instruction because "[t]he evidence does not reveal Defendant expressly communicated his intent to aid or encourage either Tucker or Sawyer." *State v. Maddux,* ___ N.C. App.___, 803 S.E.2d 463, 2017 WL 3259784, at *6 (2017) (unpublished). The Court of Appeals added:

> Further, there is no evidence to warrant the inference of aid from the relationship or friendship they shared. Defendant is Sawyer's stepfather. However, Sawyer did not live with Defendant. The only evidence linking Sawyer to Defendant's home is Defendant's admission he allowed Sawyer to "occasionally crash[ ] on his couch in the living room ... every once in a while," and one piece of mail addressed to Sawyer at Defendant's address. The evidence does not disclose a friendship or close relationship between the men. On the contrary, the evidence tends to show a contentious relationship. Defendant told Detectives Sawyer "was a liar and that you cannot trust anything that he said." Furthermore, the only evidence linking Defendant to Tucker is their mutual connection to Sawyer, living next door to one another, and Tucker's statement to Detective Creech about the bag found in her room.

-7-

> This evidence is not enough to show Defendant aided and abetted another. Accordingly, we hold the court erred by instructing the jury on the State's theory of aiding and abetting.

*Maddux,* 2017 WL 3259784, at *6 (alterations in original) (footnote and citations omitted).

Second, the Court of Appeals held that the instruction constituted plain error entitling defendant to a new trial. *Id.* at *7. The Court of Appeals correctly noted that because defendant did not object to the instruction at trial, the court must review the instruction for plain error. *Id.* at *5. Then the Court of Appeals set out the test for plain error as follows:

> Plain error occurs when the error is "so basic, so prejudicial, so lacking in its elements that justice cannot have been done [.]" *State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (quotation marks omitted) (quoting *United States v. McCaskill*, 676 F.2d 995, 1002 (4th Cir. [ ])[, *cert. denied*, 459 U.S. 1018 (1982)]). "Under the plain error rule, defendant must convince this Court not only that there was error, but that absent the error, the jury probably would have reached a different result." *State v. Jordan*, 333 N.C. 431, 440, 426 S.E.2d 692, 697 (1993) (citation omitted)."

*Id.* (alteration in original).

After reciting the test for plain error as stated above, the Court of Appeals opined that "absent the erroneous jury instruction, the jury probably would have reached a different result" for four reasons: (1) "The evidence linking Defendant to the offenses is entirely circumstantial"; (2) "There is no direct evidence linking

Defendant to the manufacturing evidence found in the house"; (3) "The items found in his home, such as the cold packs and pseudoephedrine medication, are common household products"; and (4) "Detectives found the actual manufacturing device and only evidence chemically analyzed and determined to be methamphetamine in the back yard, between Defendant and Tucker's homes." *Id.* at *7. Later in its opinion, however, the Court of Appeals concluded that "[h]ere, unlike in *Lawrence*, the evidence is not 'overwhelming and uncontroverted' showing Defendant's guilt." *Id.* (quoting *State v. Lawrence*, 365 N.C. 506, 519, 723 S.E.2d 326, 335 (2012)). As a result of its conclusion that the trial court committed plain error, the Court of Appeals granted a new trial to Defendant. *Id.*

Following the decision by the Court of Appeals, the State filed a petition for discretionary review, which we allowed on 1 March 2018. In its petition, the State requested that we examine whether the Court of Appeals erred by holding that the trial court committed plain error in giving the aiding and abetting instruction.

This Court reviews the decision of the Court of Appeals to determine whether it contains any errors of law. N.C. R. App. P. 16(a); *State v. Mumford*, 364 N.C. 394, 398, 699 S.E.2d 911, 914 (2010) (citation omitted). We agree with the Court of Appeals that the trial court erred in giving the aiding and abetting instruction. The Court of Appeals, however, incorrectly concluded that the error amounted to plain error. For the reasons stated below we conclude that the Court of Appeals erred in determining that plain error occurred.

## II.   Analysis

The Court of Appeals improperly applied the plain error standard of review to the facts here. Specifically, the Court of Appeals erred in two ways by (1) incorrectly applying the plain error standard we articulated in *State v. Lawrence*, and (2) concluding on this evidence that there was plain error when applying the correct standard.

An appellate court will apply the plain error standard of review to unpreserved instructional and evidentiary errors in criminal cases. *Lawrence*, 365 N.C. at 512, 723 S.E.2d at 330. In *Lawrence*, we reaffirmed our holding in *State v. Odom* that initially incorporated the plain error rule into North Carolina law. *Id.* at 516-18, 723 S.E.2d at 333-34; *see also Odom*, 307 N.C. at 659-62, 300 S.E.2d at 378-79 (adopting the plain error rule used by the federal courts).

In reaffirming *Odom*, we held that to demonstrate that a trial court committed plain error, the defendant must show "that a fundamental error occurred at trial." *Lawrence*, 365 N.C. at 518, 723 S.E.2d at 334 (citing *Odom*, 307 N.C. at 660, 300 S.E.2d at 378). To show fundamental error, a defendant "must establish prejudice—that, after examination of the entire record, the error 'had a probable impact on the jury's finding that the defendant was guilty.' " *Id.* at 518, 723 S.E.2d at 334 (quoting *Odom*, 307 N.C. at 660, 300 S.E.2d at 378). Further, we held that, "because plain error is to be applied cautiously and only in the exceptional case, the error will often be one that "seriously affect[s] the fairness, integrity or public reputation of judicial

proceedings." ' " *Id.* at 518, 723 S.E.2d at 334 (alteration in original) (internal citations omitted) (quoting *Odom*, 307 N.C. at 660, 300 S.E.2d at 378).

In *Lawrence*, while we reaffirmed the legal principles applicable to plain error review, we concluded that the defendant failed to meet his burden of demonstrating such error. *Id.* at 519, 723 S.E.2d at 334. Specifically, we held that the trial court's instruction on conspiracy to commit robbery with a dangerous weapon was erroneous; however, we determined that the error was not plain error, because "[i]n light of the overwhelming and uncontroverted evidence, defendant cannot show that, absent the error, the jury probably would have returned a different verdict." *Id.* at 519, 723 S.E.2d at 335.

Here the Court of Appeals stated the standard for plain error review correctly and in accord with *Lawrence*: "Defendant must demonstrate that 'absent the error, the jury probably would have reached a different result.' " *Maddux*, 2017 WL 3259784, at *7 (quoting *State v. Jordan,* 333 N.C. 431, 440, 426 S.E.2d 692, 697 (1993)). But, the court later reasoned that "[h]ere, unlike in *Lawrence*, the evidence is not 'overwhelming and uncontroverted' showing Defendant's guilt." *Id.* (quoting *Lawrence*, 365 N.C. at 519, 723 S.E.2d at 335).

The Court of Appeals concluded that the lack of "overwhelming and uncontroverted" evidence against defendant, *see id.* (quoting *Lawrence*, 365 N.C. at 519, 723 S.E.2d at 335), meant that "the jury probably would have reached a different result" absent the improper aiding and abetting instruction. *Id.* (quoting *Jordan*, 333

N.C. at 440, 426 S.E. 2d at 697). In other words, the court appears to have indicated that the lack of overwhelming and uncontroverted evidence against defendant required the conclusion that a jury probably would have reached a different result. The Court of Appeals erred in this line of reasoning. We did not hold in *Lawrence* that plain error is shown, and a new trial is required, *unless* the evidence against defendant is overwhelming and uncontroverted. Accordingly, the Court of Appeals erred to the extent it so held. *See id.*

The Court of Appeals also erred in applying the correct standard for plain error. It erred because, "after examination of the entire record," we conclude that the ample evidence of defendant's individual guilt made it unlikely that the improper aiding and abetting instruction "had a probable impact on the jury's finding that the defendant was guilty." *Lawrence*, 365 N.C. at 518, 723 S.E.2d at 334 (citing and quoting *Odom*, 307 N.C. at 660, 300 S.E.2d at 378).

Here the evidence supporting defendant's individual guilt included the following: (1) all of the items found throughout defendant's residence that the State's witnesses identified as being commonly used in the production of methamphetamine, including immediate precursor chemicals to the manufacture of methamphetamine, and (2) all of the evidence found inside the one-pot meth lab and burn barrel on defendant's property, including the plastic bottles that tested positive for methamphetamine and pseudoephedrine. After examining the entire record, we conclude that the erroneous aiding and abetting instruction did not have a probable

impact on the jury's finding that defendant was guilty because of the evidence indicating that defendant, individually, used the components found throughout his house to manufacture methamphetamine in the one-pot meth lab on his own property.

The Court of Appeals offered several explanations for its conclusions. First, the Court of Appeals determined that "[t]he evidence linking Defendant to the offenses is entirely circumstantial." *Maddux*, 2017 WL 3259784, at *7. Relatedly, the Court of Appeals stated that "[t]here is no direct evidence linking Defendant to the manufacturing evidence found in the house." *Id.* Even if accurate, these assertions are not dispositive. We have routinely stated, in the sufficiency of the evidence context, that the characterization of evidence as either direct or circumstantial does not resolve whether the evidence is sufficient. *See, e.g.*, *State v. Chekanow*, 370 N.C. 488, 492, 809 S.E.2d 546, 550 (2018) ("[T]he test of the sufficiency of the evidence to withstand the motion is the same whether the evidence is direct, circumstantial or both." (quoting *State v. Malloy*, 309 N.C. 176, 178-79, 305 S.E.2d 718, 720 (1983))); *State v. Haselden*, 357 N.C. 1, 18, 577 S.E.2d 594, 605 ("Circumstantial evidence may be sufficient to support a conviction even when 'the evidence does not rule out every hypothesis of innocence.' " (quoting *State v. Stone*, 323 N.C. 447, 452, 373 S.E.2d 430, 433 (1988))), *cert denied*, 540 U.S. 98 (2003).

Second, the Court of Appeals reasoned that the items found in defendant's house were simply common household materials. *Maddux,* 2017 WL 3259784, at *7

("The items found in his home, such as the cold packs and pseudoephedrine medication, are common household products."). But, this explanation is also unavailing because it treats the items in isolation and without regard for where they were located in the residence.

For example, the second search of defendant's master bedroom area revealed a metal strainer, a glass measuring cup, and a trash bag containing balled-up, burnt pieces of aluminum foil that were consistent with meth boats. In isolation, these items could be innocent household items. Had they been found in defendant's kitchen, one could conclude that they had no purpose outside of routine food preparation and waste disposal.

In contrast, here the metal strainer, the glass measuring cup, and the trash bag containing the balled-up, burnt aluminum foil were found in defendant's master bedroom or bathroom, where they would have no obvious or common household purpose. Additionally, the State's witnesses testified that other items used in methamphetamine production were present throughout defendant's residence and that defendant had a one-pot meth lab and a burn barrel on his property. Furthermore, chemical analysis of a plastic bottle found inside the one-pot meth lab and burn barrel tested positive for methamphetamine and pseudoephedrine. Lastly, a Walgreens receipt for pseudoephedrine was also found in defendant's bedroom. When viewed with the rest of the evidence, the metal strainer, the glass measuring cup, and the trash bag containing the burnt, aluminum foil strips appear to be

something other than mere common household items. In context, these items point more toward usage in the manufacture, possession, or trafficking of methamphetamine.

Finally, the Court of Appeals found that "the actual manufacturing device and only evidence chemically analyzed and determined to be methamphetamine [were found] in the back yard, between Defendant['s] and Tucker's homes." *Id.* at \*7. As a result, the Court of Appeals suggested that, because others had access to the burn barrel, there is insufficient evidence to establish defendant as the "sole perpetrator." *Id.* This explanation fails, as did the Court of Appeals' common household items characterization, because it views in isolation the fact that the burn barrel was accessible to others.

We acknowledge that the evidence shows the burn barrel could have been accessed by Sawyer or Tucker from Tucker's home. Nonetheless, this finding does not undermine the theory that defendant was the sole perpetrator. Specifically, the Court of Appeals recognized the existence of methamphetamine "manufacturing evidence" in defendant's residence. *Id.* Furthermore, although the one-pot meth lab and burn barrel were accessible from both residences, they were on *defendant's* property. The evidence viewed in context amply supports the conclusion that defendant used the items found in his house to manufacture methamphetamine in a one-pot meth lab on his property.

We conclude, given this evidence of defendant's individual guilt, that the erroneous aiding and abetting instruction given by the trial court here did not have "a probable impact on the jury's finding that the defendant was guilty." *Lawrence*, 365 N.C. at 518, 723 S.E.2d at 334 (quoting *Odom*, 307 N.C. at 660, 300 S.E.2d at 378).[11]

For the reasons stated above, we hold that the trial court's error in giving the aiding and abetting instruction did not amount to plain error. Accordingly, the decision of the Court of Appeals is reversed.

REVERSED.

---

[11] In addition to the conclusions reached by the Court of Appeals, defendant argues that we cannot uphold his conviction even though there is ample evidence of his individual guilt because we have held that reversible error occurs when a jury is presented with alternative theories of guilt when (1) one of the theories is not supported by the evidence, and (2) it is unclear upon which theory the jury convicted defendant. *See State v. Pakulski*, 319 N.C. 562, 574, 356 S.E.2d 319, 326 (1987). This rule, however, is not applicable to plain error cases, such as this one, in which the error complained of is not preserved. As such, we need not address the substance of this argument.