IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA19-454

Filed: 2 June 2020

New Hanover County, No. 17 CRS 051381

STATE OF NORTH CAROLINA

v.

NADINE D. STUBBS, Defendant.

Appeal by Defendant from order entered 26 October 2018 by Judge Imelda J. Pate in New Hanover County Superior Court. Heard in the Court of Appeals 5 February 2020.

*Attorney General Joshua H. Stein, by Assistant Attorney General A. Mercedes Restucha-Klem, for the State.*

*Appellate Defender Glenn Gerding, by Assistant Appellate Defender, James R. Grant, for defendant-appellant.*

MURPHY, Judge.

In 1995, our General Assembly enacted "An Act to Impose Criminal Penalties for the Abuse, Neglect, or Exploitation of Disabled or Elder Adults Living in a Domestic Setting." N.C.G.S. § 14-32.3 (2019) (enacted by 1995 S.L. Ch. 246, S.B. 127). In relevant part, this act holds individuals criminally liable if they fail to provide medical or hygienic care to an elder adult for whom they are a caretaker—either based on a familial relationship between the two or because that individual voluntarily undertook such responsibility—and the elder adult suffered serious

injury as a result of the caretaker's act or failure to act. N.C.G.S. § 14-32.3(b), (d)(1) (2019).

Defendant Nadine Stubbs was charged with neglect of an elder adult after her live-in elderly mother was left bedridden for a period of weeks before being hospitalized and eventually dying. Defendant argues the trial court erred in denying her motion to dismiss for insufficient evidence that she was, in fact, her mother's caretaker as that word is defined by N.C.G.S. § 14-32.3(d)(1). Viewing the State's evidence under the appropriate standard of review, we disagree with Defendant's argument and hold the trial court did not err in denying her motion to dismiss. We likewise disagree with Defendant's other argument on appeal, that the trial court plainly erred in allowing a video of her mother to be played for the jury.

## BACKGROUND

In 2013, Bernice Manning ("Manning") was brought to stay with her daughter, Defendant, in Wilmington. Defendant was not raised by Manning and did not meet her until she was 15 years old. Manning's daughter Pamela dropped her off for a purported three-week stay with Defendant but never returned; Manning continued living with Defendant for almost four years until her death in 2017.

### A. Manning's Medical Condition and Death

In January 2017, New Hanover County Department of Social Services ("DSS") received an anonymous report of "caretaker neglect" in regard to Manning. DSS

social worker Helen Freeman ("Freeman") visited Manning and Defendant's home on 20 January 2017 and was met at the door by Defendant's adult son, Charles, and teenaged daughter. Freeman noticed a "very, very strong odor . . . throughout the house" that intensified as she approached Manning's room. Outside Manning's door there were several sticks of incense—one still burning—placed in the doorjamb.

Although Defendant's house was "neat and clean," inside Manning's room Freeman was struck by an "[a]lmost intolerable" odor, which was so strong another social worker "had to leave the room because she couldn't tolerate [it]." That social worker described the room as smelling "like dead flesh." There was also "a tremendous amount of clutter, [about] knee-high, throughout the room." Manning was lying in bed, "wearing a fleece jacket that was unzipped, and she had no other clothes on except her socks." Manning's bed was soiled with feces and urine, and Manning herself "had urine and feces all over her . . . and it appeared that she had open wounds on her." When Freeman asked Manning how she was feeling, Manning said she was in pain and unable to walk or eat. Freeman "asked [Manning] if she wanted to go to the hospital" and Manning eventually agreed, at which time Freeman "immediately called EMS."

At the hospital, Manning was admitted to the emergency room. The ER nurse testified Manning was "dehydrated, her skin was very dry, she was lethargic . . . not verbal, she was just moaning. Her vital signs were indicative of someone very sick.

Her heart rate was very elevated, her blood pressure was very low." Manning's body was covered in so much feces and urine that it took the ER staff "[a]t least a half an hour" to clean her. Additionally, Manning's limbs were contracted, meaning "both arms and both legs were bent inwards. [The ER staff] could not straighten them out." This suggests weeks or months of "[i]mmobility, lack of use." Manning was malnourished, suffering skin breakdown, and had several pressure ulcers that are caused by skin on skin contact for a period of days or weeks.

Given Manning's condition when she was hospitalized, Freeman reported the incident to law enforcement the same day. Once she was cleaned and stabilized, Wilmington Police Detective Jeremy Barsaleau ("Barsaleau") interviewed Manning for about 10 minutes in her hospital bed; the interview was captured on video and later played for the jury during Defendant's trial. Barsaleau told Manning he was speaking with her to make sure everything was "ok at home" and to ensure she was being taken care of, and Manning said she would be fine if she could eat without being nauseous. Manning told Barsaleau, "I'm not being mistreated" and that, "I am being taken good care of."

When she arrived at the hospital, Manning had "a long list of diagnoses," including septic shock, severe acute respiratory distress syndrome, heart problems, acute kidney failure, cancer, and AIDS. After about two weeks in the hospital, Manning died of HIV infection and pneumonia.

## B. Investigation of Defendant

Based on the complaint made to DSS and Manning's condition when DSS responded, two investigations were launched: a civil investigation by DSS's Adult Protective Unit, and a criminal investigation by the Wilmington Police Department. In the days and weeks following Manning's hospitalization, both Wilmington police and DSS interviewed Defendant about her relationship with Manning and their living arrangement.

### 1. The DSS Investigation

In her DSS interview, Defendant thanked Freeman for helping her mother, but was unable to answer many of Freeman's medical questions about Manning. For instance, she did not know the names of Manning's doctors and was unaware of any medications Manning had been taking. Defendant told Freeman the two had not had any relationship to speak of before Manning came to live with her four years earlier. When asked if she helped Manning, Defendant told Freeman "she did the grocery shopping and did the other shopping for [Manning]. And she also helped her with her finances" by helping her pay her bills. Defendant also helped Manning "with bathing, . . . she would bathe her mother from the sink [because Manning] didn't take baths in the tub, or she didn't take showers[.]"

When Freeman asked how long Manning had been bedridden prior to her hospitalization, Defendant reported Manning "had been unable to get out of bed for

several weeks, since New Year's Eve." Freeman's "understanding from [Defendant] was that [Manning] was not able to walk for—for the entire month of January until I met her, so from the first through the 20th." During that time, Manning had become unable to eat but Defendant was at least providing her "Ensure and Gatorade and water." Defendant told Freeman she "had been trying to get [Manning] to go to the hospital, [but Manning] had been refusing."

## 2. The Police Investigation

Across two police interviews, Defendant largely told law enforcement the same story she told DSS: Defendant explained how Manning came to live with her and described their relationship, which was not particularly close. Defendant said she had attempted to arrange medical care for Manning in the past, but Manning refused the care. When Manning needed help arranging things like Medicaid, food stamps, and social security, Defendant helped her do so—including transporting Manning to and from the relevant offices. Defendant told police she loved her mother, never mistreated her, and did her best to help her.

Defendant told police Manning was a very private person. In 2016, for instance, Manning had a DSS caseworker with whom Defendant had discussed getting "some kind of document" that would enable her to force Manning to go to the doctor. According to Defendant, Manning responded by threatening to sue the DSS worker if she told Defendant "anything . . . about my business[.]" Manning also kept

a machete in her room which she would use to threaten unwanted visitors—including Defendant—who tried to enter her room.

Defendant's description of Manning as a private, guarded person is consistent with the way other loved ones described her. For example, Manning's sister Annie described her as "antisocial and standoffish," and told police that, about a week before Manning was hospitalized, Defendant "told [Annie] that she was begging Manning to go to the hospital but Manning refused, told [Defendant] she would be okay." Annie told police "Manning kept to herself and didn't disclose her medical conditions[,]" and that she would "tell people to stay out of her business." Police also spoke with one of Manning's daughters, Gina, who "indicated that [Manning] was . . . prone to cussing people out."

When discussing the weeks preceding Manning's hospitalization, Defendant told police her adult son, Charles, told her she needed to call an ambulance for Manning "or if not, I'm fixing to do something about it right now." At some point in early January, Defendant also helped Manning secure a life insurance policy in the amount of $10,000.00. Manning's policy was later voided because she had failed to disclose her HIV diagnosis to the insurer.

## C. Indictment and Trial

The New Hanover County Grand Jury indicted Defendant on one count of neglect of an elder adult by a caretaker resulting in serious physical injury. During

a jury trial in Superior Court, Defendant moved to dismiss the sole charge against her for insufficient evidence at the conclusion of the State's case. Defendant argued the State failed to present "sufficient evidence of [Defendant] being [Manning's] caretaker." After giving both parties an opportunity to argue the motion and asking a number of questions, the trial court denied Defendant's motion. Defendant did not put on any evidence, and the case was submitted to the jury, which convicted Defendant as charged. Defendant was sentenced to a mitigated-range sentence of 8 to 19 months imprisonment, suspended for 36 months of supervised probation with a special condition that she serve 60 days in the New Hanover County jail. Defendant gave timely notice of appeal.

## ANALYSIS

### A. Motion to Dismiss

"When reviewing a sufficiency of the evidence claim, this Court considers whether the evidence, taken in the light most favorable to the [S]tate and allowing every reasonable inference to be drawn therefrom, constitutes substantial evidence of each element of the crime charged." *State v. Taylor*, 362 N.C. 514, 538, 669 S.E.2d 239, 261 (2008). "In making its determination, the trial court must consider all evidence admitted, whether competent or incompetent, in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving any

contradictions in its favor." *State v. Rose*, 339 N.C. 172, 192, 451 S.E.2d 211, 223 (1994).

Under N.C.G.S. § 14-32.3(b), the elements of neglect of an elder adult as that charge applied to Defendant are:

1. The Defendant is a "caretaker" of an "elder adult" who is residing in a domestic setting;
2. The Defendant wantonly, recklessly, or with gross carelessness fails to provide medical or hygienic care to the elder adult;
3. Such failure to act causes the elder adult to suffer an injury.

N.C.G.S. § 14.32.3(b) (2019). A "caretaker" is: "A person who has the responsibility for the care of a disabled or elder adult as a result of family relationship or who has assumed the responsibility for the care of a disabled or elder adult voluntarily or by contract." *Id.* at (d)(1). That definition creates two paths to becoming a caretaker: (1) assuming responsibility for the care of an elderly person voluntarily or by contract; or (2) becoming responsible for the care of an elderly person as a result of a family relationship—a de facto caretaker relationship. Here, there is no evidence that Defendant entered into a contractual agreement to become Manning's caretaker, so, to avoid dismissal, the State must have presented sufficient evidence that Defendant voluntarily assumed responsibility for Manning.

Defendant does not argue the State presented insufficient evidence that: (a) Manning was an "elder adult" as defined by the statute,[1] (b) she satisfied the *actus reus* and *mens rea* requirements of the statute—failing to provide care and doing so with gross carelessness; or (c) that Defendant's actions caused Manning to suffer a serious injury. The only argument Defendant advanced either at trial or on appeal is that she does not fit the definition of a "caretaker" under the statute because she did not voluntarily undertake such a responsibility.

The caselaw addressing the elder neglect and abuse statute is sparse; only one North Carolina case has even cited N.C.G.S. § 14-32.3 since it was enacted in 1995, *State v. Forte*, 206 N.C. App. 699, 698 S.E.2d 745 (2010). In *Forte*, the defendant's appeal was similar to this one. He argued the trial court erred in denying his motion to dismiss for insufficient evidence because the State failed to produce sufficient evidence that he was a "caretaker" of the victim. *Id.* at 706, 698 S.E.2d at 750. There, the defendant and victim did not have a familial relationship, but the State offered evidence that the defendant had voluntarily become the victim's caretaker by performing odd jobs, running errands, and writing checks for the victim; taking him to buy a headstone and dentures, helping him renovate his home, and cutting his toenails "on at least one occasion." *Id.* Although there was no evidence Defendant

---

[1] An "elder adult" is defined as: "A person 60 years of age or older who is not able to provide for the social, medical, psychiatric, psychological, financial, or legal services necessary to safeguard the person's rights and resources and to maintain the person's physical and mental well-being." N.C.G.S. § 14-32.3(d)(4) (2019).

had ever "provide[d] any personal care for [the victim], [the victim] and [d]efendant had a close relationship and [d]efendant was around [the victim's] home with increasing frequency." *Id.* We held:

> Defendant argues that these "limited activities" are not sufficient to transform the "friendly relationship" between him and [the victim] into that of caretaker and charge. We disagree. We conclude the evidence was sufficient to allow the jury to find that Defendant had "assumed the responsibility for the care" of [the victim].

*Id.*

Defendant argues that, unlike the defendant and victim in Forte, she and Manning did not have a "close relationship." Although Manning was Defendant's mother, it is true that the two were not as close as the defendant and victim in *Forte*. Defendant did not meet Manning until she was 15 years old, and was not raised by Manning. Those close to Manning described her as "a very private person [who] liked to keep to herself[.]" Defendant described their relationship as "more like roommates." Nevertheless, the State presented evidence that, in Manning's final weeks, Defendant: bathed her mother or at least "helped her bathe from the sink"; purchased food and supplies for Manning; assisted Manning in paying her bills; helped with "general normal care, daily care things"; and purchased life insurance on Manning's behalf and at her request. Based on the statutory definition of "caretaker" and our decision in *Forte*, this evidence is sufficient to send the question of

Defendant's caretaker status to a jury. The trial court did not err in denying Defendant's motion to dismiss for insufficient evidence.

## B. Admission of Manning's Police Interview

Defendant's second argument on appeal is that the trial court committed plain error in allowing a video of Manning's interview with police to be played for the jury at trial. Defendant argues that Manning's statements in the video are hearsay, and that "[a]bsent [Manning's] statements [in the video], there would have been no evidence at all suggesting [Defendant] was Manning's caretaker, and the trial court would have granted the defense's motion to dismiss."

There was no objection to the entrance of this video at trial, and we "apply the plain error standard of review to unpreserved . . . evidentiary errors in criminal cases." *State v. Maddux*, 371 N.C. 558, 564, 819 S.E.2d 367, 371 (2018).

> For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial. To show that an error was fundamental, a defendant must establish prejudice – that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty. Moreover, because plain error is to be applied cautiously and only in the exceptional case, the error will often be one that seriously affects the fairness, integrity or public reputation of judicial proceedings.

*State v. Lawrence*, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012) (internal citations, alterations, and quotation marks omitted).

Even if the trial court did err in admitting Manning's interview with police, we cannot conclude the error was prejudicial. Defendant's argument as to prejudice is that Manning's own words in the video were the only admissible evidence that Defendant was a "caretaker" under the law. As evidenced by our analysis above, that argument is unpersuasive. Our conclusion that the State put forth sufficient evidence to prove Defendant was a "caretaker" was reached without regard to the challenged interview, or anything Manning told Barsaleau during her interview. Rather, the testimony of the DSS workers, police officers, and medical professionals who worked on this case, along with Defendant's own statements to DSS and police, provide sufficient evidence that Defendant was Manning's caretaker. As our analysis above demonstrates, there is sufficient evidence from which a jury could conclude Defendant was Manning's caretaker regardless of anything Manning told police in her interview.

Moreover, one could reasonably argue Manning's interview was more helpful than it was prejudicial to Defendant's argument that she was innocent. For example, Manning told Barsaleau, "I'm not being mistreated" and that, "I am being taken good care of." Indeed, Defendant's attorney relied upon these quotes during his cross-examination of Barsaleau, making sure the jurors had heard Manning tell Barsaleau Defendant was taking good care of her.

Even without the evidence from Manning's interview, the State's evidence was adequate to prove Defendant was Manning's caretaker. As Defendant's only real argument[2] as to prejudice is that without Manning's interview a reasonable juror could not have concluded Defendant was a "caretaker" under the statute, we cannot conclude—after a careful examination of the entire record—Defendant established the trial court's purported error had a probable impact on the jury's conclusion that she was Manning's caretaker or its eventual guilty verdict. The trial court did not commit plain error in allow Manning's interview with police to be played for the jury.

## CONCLUSION

The State presented sufficient evidence from which a reasonable jury could conclude Defendant was Manning's "caretaker" and therefore guilty of neglecting an elder adult in violation of N.C.G.S. § 14-32.3. The trial court did not err in denying Defendant's motion to dismiss for insufficient evidence. Additionally, the trial court did not plainly err in allowing the video of Manning's interview with police to be played for the jury.

AFFIRMED.

---

[2] Defendant also notes that "given Manning's frail and distressed appearance, the video interview was also highly prejudicial and inflammatory for reasons unrelated to the content of the statements." This does not amount to an independent argument regarding prejudice given that "Defendant cites no law in support of [her] contention" that the alleged inflammatory nature of this previously unchallenged evidence constitutes grounds for a new trial. *See Hennessey v. Duckworth*, 231 N.C. App. 17, 24, 752 S.E.2d 194, 200 (2013). Nevertheless, this reasoning is unpersuasive given that the State introduced numerous unchallenged photographs of Manning both before she was taken to the hospital and afterward—many of which were much more graphic in their depiction of her "frail and distressed appearance" at that time than the video at issue.

Judges ZACHARY and ARROWOOD concur.