IN THE SUPREME COURT OF NORTH CAROLINA

No. 138A23

Filed 23 May 2024

STATE OF NORTH CAROLINA

v.

JOSHUA DAVID REBER

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 289 N.C. App. 66 (2023), reversing a judgment entered on 9 August 2021 by Judge Forrest D. Bridges in Superior Court, Ashe County, and remanding the case. Heard in the Supreme Court on 13 February 2024.

*Joshua H. Stein, Attorney General, by Sherri Horner Lawrence, Special Deputy Attorney General, for the State-appellant.*

*Daniel M. Blau for defendant-appellee.*

DIETZ, Justice.

Defendant Joshua Reber appeals his convictions for raping and sexually abusing a young child. A divided panel of the Court of Appeals held that the trial court committed plain error by admitting certain evidence from the State's cross-examination of Reber and erred by failing to intervene on its own initiative when the State made improper remarks during closing argument.

As explained below, the Court of Appeals majority did not properly apply the exacting standards of review for these unpreserved issues. Applying those standards, Reber failed to satisfy the prejudice prong of plain error review and failed to show

that the State's remarks were so grossly improper that they compelled the trial court to intervene *ex mero motu*. We therefore reverse the decision of the Court of Appeals and remand for consideration of Reber's remaining arguments.

**Facts and Procedural History**

In 2015, eleven-year-old K.W.[1] became close with a boy from school that she considered her boyfriend. This relationship made K.W. feel guilty because she worried she was "cheating on him." For several years, Reber, a friend of K.W.'s family, had been taking K.W. to isolated locations, such as a deer blind in the woods near her house, and sexually abusing her.

Ultimately, K.W. confided in her school-age boyfriend, who insisted that she tell her mother about Reber's abuse. K.W.'s mother contacted law enforcement, who immediately began an investigation. The State later charged Reber with multiple counts of rape of a child and sexual offense with a child. The case went to trial in 2021.

At trial, K.W. recounted in excruciating detail how, beginning when she was eight years old, Reber took her into the woods without telling her family, often late at night, where he sexually abused her.

Reber took the stand in his own defense and acknowledged taking K.W. into the woods alone at night without telling anyone. But he denied that he ever raped or

---

[1] Under Rule 42(b) of the North Carolina Rules of Appellate Procedure, the parties agreed to use the initials "K.W." to refer to the juvenile. We use the initials agreed to by the parties.

sexually abused K.W. During his testimony, Reber described normal sexual relationships he had with adult women, including a woman named Danielle. He explained that his romantic relationship with Danielle started in the fall of 2015, and before that, Danielle was "just a friend."

On cross-examination, the prosecutor pursued a series of questions that were based on Reber's testimony about his relationship with Danielle. The prosecutor first asked about text messages recovered from Reber's phone during the time period when he claimed Danielle was "just a friend."

In the first series of text messages, Reber told Danielle that he remembered seeing her bare breasts when they had a previous romantic encounter. After Danielle stated that she did not remember that event, Reber replied, "You did get drunk pretty fast." Reber did not object to this question and answer.

Later in the questioning, the prosecutor asked Reber about another text exchange with Danielle. These text messages concerned Reber's attempts to find a place to have sex with Danielle.

In the messages, Reber expressed concern about getting a motel room to have sex because he would need to take his daughter with him, and she might tell his grandparents that he was having sex. Reber's grandparents had strong religious beliefs and insisted that he not engage in sexual activity outside of marriage.

In the text exchange with Danielle, Reber acknowledged that if they went to a hotel to have sex, he could ask his daughter not to say anything to his grandparents.

The prosecutor then asked Reber, "So you would encourage a child, if asked, not to tell on you?" Reber responded, "Well, on that set of circumstance[s], yes." Reber also did not object to this line of questioning.

The prosecutor also established without objection that Reber had sex with a number of women using a method that Reber referred to as the "pull-out" method, during which he did not use a condom or any form of contraception.

During closing argument, the prosecutor made two statements that referenced Reber's testimony described above. The first statement referenced Reber's sexual history with Danielle:

> Danielle, a woman who when he was developing a friendship, his first sexual encounter with her involved taking her boobs out of her shirt and having intercourse with her and you've seen the text messages to show that she was too drunk to even remember it to even remember taking her shirt off.

The second statement regarded Reber's use of the "pull-out" method of contraception during sexual intercourse:

> An eight- to 11-year-old child having sex with a man 16 years her senior who by his own testimony is sleeping with other women in this community with no protection. You think about that. You think about an eight- or nine-year-old walking around pregnant. You think about an eight- or nine-year-old poking around with herpes or gonorrhea or syphilis or Aids [sic].

Reber did not object to these statements during closing argument.

The jury found Reber guilty of four counts of rape of a child and six counts of sex offense with a child. The trial court sentenced Reber to two consecutive terms of

300 to 420 months in prison.

Reber appealed and argued that it was plain error to admit the cross-examination testimony described above. Reber also argued that it was reversible error to permit the prosecutor to make the statements during closing argument that are quoted above.

A divided Court of Appeals reversed Reber's convictions and ordered a new trial. *State v. Reber*, 289 N.C. App. 66, 83 (2023). The majority held that the introduction of the challenged evidence on cross-examination amounted to plain error and that the prosecutor's statements during closing argument were so grossly improper that the trial court should have intervened on its own initiative. *Id.* at 74, 82. The dissent asserted that "even assuming" there were evidentiary errors, Reber could not meet the prejudice prong of plain error review because he failed to show "that the jury's verdict *probably* would have been different had the jury not heard this testimony." *Id.* at 83–84 (Dillon, J., dissenting). The dissent also concluded that the statements during closing argument were not grossly improper and therefore not reversible error. *Id.*

The State filed a timely notice of appeal based on the dissent. *See* N.C.G.S. § 7A-30(2) (2023).

## Analysis

### I. Evidentiary challenges

We begin with the Court of Appeals' analysis of Reber's evidentiary challenges. Reber's appeal from the admission of his cross-examination testimony turns on the application of a standard of review known as "plain error." Ordinarily, to preserve an issue for appellate review, a litigant must raise the issue and secure a ruling from the trial court. N.C. R. App. P. 10(a)(1). For evidentiary and instructional errors, this typically requires the party challenging the evidence or jury instruction to make a timely objection. *Id.* Without an objection, that error is deemed unpreserved, and the issue is therefore waived on appeal. *State v. Lawrence*, 365 N.C. 506, 512 (2012).

This preservation rule serves crucial functions in our justice system. First, and most obviously, it promotes the efficiency of a justice system with limited resources. *State v. Odom*, 307 N.C. 655, 660 (1983). When a party alerts the trial court of a potential error, the court can correct it. For example, with an evidentiary objection, the trial court can refuse to admit the evidence or offer a limiting instruction to the jury. If the error is not identified until after the trial, the only option is to set aside the judgment and order a new trial. *See id.* This is an incredibly costly alternative.

Second, this preservation rule reduces the risk of "gamesmanship" in the appellate process. *State v. Bursell*, 372 N.C. 196, 199 (2019). As noted above, when there is a reversible evidentiary or instructional error in a criminal trial, the remedy on appeal is to vacate the judgment and remand for a new trial. A preservation

requirement "prevents parties from allowing evidence to be introduced or other things to happen during a trial as a matter of trial strategy and then assigning error to them if the strategy does not work." *Id.* (cleaned up).

Despite the important functions of this preservation rule, its application can be harsh. There will be times when the lack of preservation means the trial court committed a reversible error but the aggrieved party cannot raise that error on appeal.

Plain error exists for the rare cases where the harshness of this preservation rule vastly outweighs its benefits. When we first recognized the rule in *Odom*, we emphasized that it was available only in extraordinary cases. 307 N.C. at 660. We explained that it should be "applied cautiously and only in the exceptional case," that it is reserved for "grave error which amounts to a denial of a fundamental right of the accused," and that it focuses on error that has "resulted in a miscarriage of justice" or the denial of a "fair trial." *Lawrence*, 365 N.C. at 516–17 (quoting *Odom*, 307 N.C. at 660).

When we issued our "doctrinal statement" on plain error in *Lawrence*, we incorporated these principles into a three-factor test: First, the defendant must show that a fundamental error occurred at trial. 365 N.C. at 518. Second, the defendant must show that the error had a "probable impact" on the outcome, meaning that "absent the error, the jury probably would have returned a different verdict." *Id.* at 518–19. Finally, the defendant must show that the error is an "exceptional case" that

warrants plain error review, typically by showing that the error seriously affects "the fairness, integrity or public reputation of judicial proceedings." *Id.* at 518.[2]

In the years since *Lawrence*, the Court of Appeals consistently has struggled with the application of the second prong of this test. *See, e.g.*, *State v. Towe*, 366 N.C. 56, 61–62 (2012) (rejecting Court of Appeals' plain error analysis); *State v. Juarez*, 369 N.C. 351, 358 (2016) (same); *State v. Maddux*, 371 N.C. 558, 565 (2018) (same).

This struggle appears to stem from the word choice in *Lawrence*. When initially describing this second prong (which we will refer to as the "prejudice" prong), *Lawrence* stated that "a defendant must establish prejudice—that, after examination of the entire record, the error had a *probable impact* on the jury's finding that the defendant was guilty." *Lawrence*, 365 N.C. at 518 (cleaned up) (emphasis added).

In isolation, this standard appears similar to other standards used to measure prejudice. For example, when an evidentiary error is preserved in our state system, the harmless error test asks whether the defendant has shown a "reasonable

---

[2] The reasoning of our dissenting colleagues relies entirely on the premise that plain error does not have a multi-factor test and instead is a sort of holistic analysis. This reasoning is inconsistent with how *Lawrence* articulated the test. Moreover, in *Lawrence* we explained that "this Court relied heavily on the federal standard when it adopted plain error review." *Id.* at 515. We then examined in detail the "four-factor test" for plain error in federal doctrine, evaluating each "prong" of that analysis before condensing it into our own three-factor test for state doctrine (combining the "error" and "plain" factors into one "fundamental error" factor). *Id.* at 515–18. No decision of this Court has ever suggested that the multiple factors in *Lawrence* (inspired by the multiple factors in the federal test) are not, in fact, multiple factors. The dissent's new theory of plain error—that it involves one holistic analysis—is an invention not from our precedent, but from necessity. It is necessary both to justify the dissent's disagreement with our prejudice analysis and to justify the dissent's lengthy analysis of issues that were not the basis of the Court of Appeals dissent. *See post*, footnote 3.

possibility" that, but for the error, the jury would have reached a different result. *State v. Brichikov*, 383 N.C. 543, 557 (2022). As we have explained, this is "a non-exacting inquiry." *Id.* After all, there can be a reasonable possibility of some event occurring even if it is not the most likely outcome.

Similarly, in claims for ineffective assistance of counsel, the test for prejudice asks whether there is a "reasonable probability" that, absent the errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 695 (1984). To satisfy this test, the defendant "need not show that counsel's deficient conduct *more likely than not* altered the outcome in the case." *Id.* at 693 (emphasis added). This is so because, as with a "reasonable possibility," there can be a "reasonable probability" of some event occurring even if a different outcome is even more probable.

Although the phrase "probable impact" in the plain error test might appear similar to these other standards, *Lawrence* further articulated the test in a way that makes it far more exacting. When the Court described the test for showing a "probable impact," it quoted language from *State v. Walker* examining whether "absent the error the jury *probably would have* reached a different verdict." *Lawrence*, 365 N.C. at 518 (emphasis added) (quoting *State v. Walker*, 316 N.C. 33, 39 (1986)). When we then applied the "probable impact" test to the facts in *Lawrence*, we followed *Walker*'s language and examined whether absent the error, the jury *probably would have* returned a different verdict. *Id.* at 519.

This wording is important because this standard—showing that a jury *probably would have* reached a different result—requires a showing that the outcome is significantly more likely than not. In ordinary English usage, an event will "probably" occur if it is "almost certainly" the expected outcome; it is treated as synonymous with words such as "presumably" and "doubtless." *Probably*, New Oxford American Dictionary (3d ed. 2010); *Probably*, Merriam-Webster's Collegiate Dictionary (11th ed. 2007).

Since *Lawrence*, this Court has repeatedly disavowed approaches to the prejudice analysis that weaken this exacting standard. For example, in *Towe*, we rejected a Court of Appeals decision that held there was a "probable impact" because it was "highly plausible that the jury could have reached a different result." 366 N.C. at 61–62. We reiterated that "the plain error standard requires a determination that the jury *probably would have* returned a different result." *Id.* at 57.

In *Maddux*, we rejected a Court of Appeals holding that a "lack of overwhelming and uncontroverted evidence against defendant required the conclusion that a jury probably would have reached a different result." 371 N.C. at 564–65. We emphasized that the proper consideration was not the strength of the State's evidence, but whether, "absent the error, the jury probably would have reached a different result." *Id.* at 564. Similarly, in *Juarez*, we rejected the Court of Appeals' plain error analysis and again emphasized that the standard requires a showing that it is "probable, not just possible," that the outcome would have been

different absent the error. 369 N.C. at 358.

The Court of Appeals majority in this case again failed to apply the exacting prejudice standard required for plain error review. The majority concluded that the plain error test was satisfied because the challenged evidence from Reber's cross-examination was "highly prejudicial" and therefore "made it more likely that the jury would convict Defendant based on his character, rather than the facts presented." *Reber*, 289 N.C. App. at 78. Thus, the Court of Appeals reasoned, the challenged evidence had a probable impact on the outcome. *Id.* at 79.

This analysis is not consistent with our precedent. The question is not whether the challenged evidence made it more likely that the jury would reach the *same* result. Instead, the analysis is whether, without that evidence, the jury probably would have reached a *different* result. This is a crucial distinction because something can become more likely to occur yet still be far from *probably* going to occur.

This case serves as an example of this principle. Although the State's only direct evidence of Reber's crimes was K.W.'s own testimony, there was plenty of surrounding evidence that supported K.W.'s credibility. K.W. described her sexual abuse using details that an eleven-year-old child otherwise would not be expected to know. Reber provided no explanation for how K.W. could have known these details of sexual activity.

Reber denied K.W.'s allegations in his own testimony, but there were a number of credibility issues with that testimony. First, Reber conceded that he was alone with

K.W. during many of the times when K.W. alleged that the abuse occurred. For example, K.W. testified that Reber repeatedly sexually abused her in a deer blind near her house. Reber admitted that he took K.W. to that deer blind or a nearby picnic table without telling K.W.'s parents. When the prosecutor asked Reber about taking an "8- to 11-year-old, out into the dark with a man 16 years older than her" without telling her parents or anyone else, Reber simply responded that he "didn't really see nothing wrong with it."

K.W. also testified that she used Snapchat to communicate and send nude photos back and forth with Reber. K.W. explained that they used Snapchat to exchange the nude photographs, rather than other social media applications, because photographs "disappear on Snapchat."

In his trial testimony, Reber insisted that he never used Snapchat, explaining that he "couldn't figure it out" and "didn't understand how to really mess with that too much." But the prosecutor established with Reber that he was "really tech savvy" and would often fix computer issues for his girlfriend, grandmother, and for residents of a nearby group home. The prosecutor also established that he regularly played sophisticated video games. This line of questioning led to the following exchange:

> Q. But you couldn't figure out how to use Snapchat?
>
> A. Well, I'm not real big on pictures and stuff so I really didn't even try.
>
> Q. So you've gone from not being able to figure it out to not really trying?

> A. Well, I didn't — couldn't figure it out anyways, but I didn't even try to figure it out even if I wanted. I mean, there was no need to.

When investigators seized Reber's cell phone, they discovered that all of the social media applications had an installation date in May 2015, the month after K.W. alleged that the abuse ended. There was no data on the phone concerning Reber's social media use before that time.

To be sure, K.W. also had some potential credibility issues. For example, K.W. told her mother that Reber had a "straight" mole either on his pubic line or where his leg "meets the butt." Law enforcement took photographs of Reber's genital area that did not reveal a mole. But, to be fair, the officer who conducted the forensic inspection testified at trial that he did not take photographs of Reber's backside where his leg connects to his buttocks. The officer also acknowledged that he had never seen a "straight" mole before and that Reber had some dark veins on his genitals.

In addition, although K.W. testified that most of the sexual abuse with Reber occurred in the deer blind or at the picnic table in the woods behind her home, she testified that there were a few times when the abuse occurred at Reber's home. She described one instance in which she remained at home with Reber while members of his family went to church. Reber's grandmother contradicted this testimony, explaining that she could not recall any time that K.W. stayed behind with Reber while others went to church.

All of this is to say that, disregarding the challenged evidence, this was a fairly

close case for the jury, based mostly on witness credibility. But a close case is not enough to prevail on the prejudice prong of plain error. The Court of Appeals majority focused on the "highly prejudicial" impact of the challenged evidence and how that evidence "made it more likely" that the jury would convict. *Reber*, 289 N.C. App. at 78.

As explained above, the question on plain error is not whether the challenged evidence increased the likelihood of the jury reaching the *same* verdict. It examines the opposite question—whether, absent that evidence, the jury probably would have returned a *different* verdict. *Lawrence*, 365 N.C. at 519. In other words, the test examines the state of all the evidence except for the challenged evidence and asks whether, in light of that remaining evidence, the jury probably would have done something different.

Reber has not met that burden here. As the Court of Appeals dissent correctly acknowledged, it is certainly *possible* that the jury would have acquitted Reber. Likewise, it is certainly *possible* that the jury would have deadlocked and been unable to return any verdict. But Reber has not shown that the jury *probably* would have done so. K.W. told a compelling account of life-altering sexual abuse. She acknowledged that there were gaps in her memory but recounted specific details of the abuse on the witness stand that matched her initial descriptions with child abuse counselors many years earlier.

Reber denied the allegations in his own testimony, but the jury may have

questioned his credibility, particularly in light of his admission that he took K.W. to isolated locations late at night without telling anyone and his shifting answers concerning Snapchat.

In short, viewing all the remaining evidence, this was not a particularly strong case for the State, but it also was not a case where the jury probably would have reached a different result. Accordingly, Reber failed to satisfy the exacting standard to show plain error, and the Court of Appeals erred by holding that he did so.[3]

## II.   Statements during closing argument

We next turn to the prosecutor's statements during closing argument. As with Reber's evidentiary challenges, this issue was not preserved by a timely objection at trial. Thus, under the general preservation rules applicable to criminal trials, this issue is waived and cannot be raised on appeal. *See* N.C. R. App. P. 10(a)(1). Moreover, plain error review does not apply to this issue because plain error is reserved for evidentiary or instructional errors. *Lawrence*, 365 N.C. at 516. Closing arguments are not evidence. *State v. Jaynes*, 353 N.C. 534, 558 (2001).

---

[3] Our dissenting colleagues spend considerable time addressing why Rule 404(b) of the Rules of Evidence prohibits certain character evidence, why the challenged evidence in this case was inadmissible under Rule 404(b), and why Reber did not open the door to admission of that evidence through his own testimony on direct examination. Even Reber acknowledges in his briefing that "the Rule 404(b) question is not before this Court" because that issue "was not the basis of the dissenting opinion." Indeed, the Court of Appeals dissent expressly declined to address the Rule 404(b) issue, instead explaining that "assuming" there was an error, there was no resulting prejudice. *Reber*, 289 N.C. App. at 83 (Dillon, J., dissenting). Because this case is before us solely based on the reasoning in that dissent, we lack jurisdiction to examine issues that the dissent chose not to address. *See Cryan v. Nat'l Council of YMCA*, 384 N.C. 569, 574 (2023); *Morris v. Rodeberg*, 385 N.C. 405, 415 (2023).

Nevertheless, this Court created a narrow exception to the preservation rules for statements during closing argument so "grossly improper" that the trial court was compelled to intervene on its own initiative. *State v. Tart*, 372 N.C. 73, 81 (2019). This is an exceedingly high bar. It applies only when the prosecutor's statements went so far beyond the "parameters of propriety" that the trial court is forced to intervene to "protect the rights of the parties and the sanctity of the proceedings." *State v. Jones*, 355 N.C. 117, 133 (2002).

Reber argues that two separate statements during the State's closing argument satisfy this "grossly improper" standard and compelled the trial court to intervene. These arguments fail for separate reasons.

Reber first points to the prosecutor's statement that he told his ex-girlfriend Danielle that he touched her bare breasts when she was too heavily intoxicated to remember.

This statement references evidence that is the subject of Reber's plain error argument discussed above. The Court of Appeals majority held that this statement was "based on improperly admitted evidence"—a conclusion that followed from the majority's earlier holding that it was plain error to admit that evidence. *Reber*, 289 N.C. App. at 82.

As explained above, we reject that determination; the admission of that cross-examination testimony was not plain error. Our holding on this issue invalidates the reasoning of the Court of Appeals. It is proper for a prosecutor during closing

argument to describe testimony or other evidence that was introduced during the trial. *Jaynes*, 353 N.C. at 560–61. Having determined that the introduction of this evidence was not plain error, referring to that evidence during closing argument cannot meet the "grossly improper" standard. When evidence is introduced without objection at trial and does not meet the criteria for plain error, it is well within the "parameters of propriety" for a trial court to permit that evidence to be described in closing arguments. *See Jones*, 355 N.C. at 133.

Reber next points to statements by the prosecutor that he did not use a condom when having sex with his adult partners. Relying on this evidence, the prosecutor then told the jury: "You think about that. You think about an eight- or nine-year-old walking around pregnant. You think about an eight- or nine-year-old poking around with herpes or gonorrhea or syphilis or Aids [sic]."

The Court of Appeals majority held that this remark was a "thinly veiled attempt to appeal to the jury's emotions" and was an improper attempt to portray Reber as "sexually manipulative, promiscuous, and a carrier of sexually transmitted diseases." *Reber*, 289 N.C. App. at 82.

We agree with the Court of Appeals majority that these statements were an improper appeal to the jury's emotions, rather than an appeal to reason. If Reber had timely objected, this might be a different case. But our case law has emphasized that these sorts of inflammatory statements appealing to the jury's emotions—ones that might be reversible error if preserved—still often fail to meet the much higher

standard requiring the trial court to intervene on its own.

In *State v. Hamlet*, for example, the prosecutor referred to the defendant as an "animal" who was "the baddest on the block and everybody knows it." 312 N.C. 162, 172–73 (1984). We noted that it was error for a prosecutor to make "comparisons of criminal defendants to members of the animal kingdom" but held that doing so "was not so improper as to require action by the trial court *ex mero motu* given the defendant's failure to object." *Id.* at 173.

Similarly, in *State v. Murillo*, the prosecutor discredited the defendant's expert witness by telling the jury that it is the "sad state of our legal system, that when you need someone to say something, you can find them. You can pay them enough and they'll say it." 349 N.C. 573, 604 (1998). We cited past case law holding that this type of statement was error, but ultimately held that "we cannot conclude that the prosecutor's arguments were so grossly improper as to require the trial court to intervene *ex mero motu* when, at trial, defense counsel apparently did not believe the argument was prejudicial." *Id.* at 605–06.

Here, too, we do not condone a prosecutor's request for the jury to imagine a young child becoming pregnant or suffering from various sexually transmitted diseases when there was no evidence that any of these things occurred in this case. But this isolated statement during closing argument simply does not meet the "grossly improper" standard as it has developed in our case law. As we explained in *Murillo*, unless the challenged statements meet this high bar, we cannot fault the

trial court for failing to intervene when "defense counsel apparently did not believe the argument was prejudicial." *Id.* at 606. We therefore agree with the Court of Appeals dissent that this statement during closing argument, although likely objectionable, is not so egregious that it is reversible error when unpreserved.

We conclude with an observation about Reber's arguments on appeal. Every one of these arguments—the arguments on which the Court of Appeals relied for its ruling and a number of arguments that the Court of Appeals did not address—involve issues not preserved at trial. But this is hardly a case of trial counsel asleep at the switch. Reber's counsel put on a robust defense that included witnesses who contradicted the State's evidence and testimony that cast doubt on the thoroughness of the State's investigation. Reber's counsel also made copious objections to the State's evidence. The trial court sustained many of those objections.

From the perspective of the trial court, Reber and his counsel had a strategy to obtain an acquittal and were acting on it—meaning this is precisely the sort of case where the trial court may have been particularly cautious of intervening on its own initiative when defense counsel was silent, worried that doing so may undermine the defendant's strategy at trial.

In his briefing to this Court, Reber criticized the State for pointing out that his counsel's "lack of objection may have been a strategic decision." Reber's premise is correct—whether the failure to object was part of a strategic decision is irrelevant for both plain error review and the "grossly improper" standard for unpreserved

objections during closing argument.

But this highlights a crucial point about these two exceptional standards of review: the bar is set exceedingly high because whenever these claims exist on direct appeal, there will be a corresponding claim of ineffective assistance of counsel that can be pursued in a motion for appropriate relief. There are several reasons why that ineffective assistance claim will often be a better vehicle to raise these issues.

First, as explained above and as the Court of Appeals dissent correctly observed, the prejudice standard for ineffective assistance claims is lower—the defendant need only show a "reasonable probability" that absent the error the jury would have reached a different result. *Strickland*, 466 U.S. at 693, 695. This means a defendant might prevail on an ineffective assistance claim even when unable to prevail on plain error review.

Second, an ineffective assistance claim brought in a motion for appropriate relief avoids the gamesmanship concern we discussed above; it provides a forum where a fact-finder can determine whether the failure to object was indeed a reasonable strategic decision, or instead a deficiency on the part of counsel. *See, e.g.*, *State v. Todd*, 369 N.C. 707, 712 (2017).

The record in this case does not indicate whether Reber has pursued corresponding ineffective assistance claims in a motion for appropriate relief. Nothing in our holding today precludes him from doing so.

## Conclusion

We reverse the decision of the Court of Appeals and remand for consideration of Reber's remaining arguments on appeal.

REVERSED AND REMANDED.

Justice EARLS dissenting.

This case involves the introduction of Rule 404(b) evidence in a case where there is no physical or medical evidence and the only evidence that a criminal offense occurred is the testimony of the complaining witness. The outcome of this case was based solely on the jury's perception of each witnesses' credibility, including the defendant's. While the majority neglects to mention the type of evidence at issue in this case, namely that it was 404(b) character evidence, this fact is necessary to determining whether the error in Mr. Reber's case meets North Carolina's plain error standard. In all cases, the risk of improperly admitted 404(b) evidence is that it will diminish the defendant's credibility, inflame the passions of the jury, and lead to a verdict based on an improper basis, such as emotion. *See State v. Kimbrell*, 320 N.C. 762, 768–69 (1987). However, this risk is at its highest in cases where the jury's decision is based entirely on the perceived truthfulness of witnesses.

We recently noted in a similar case where we found prejudicial plain error in the admission of testimony bearing on a witness's credibility, "where, as here, the sole direct evidence of sexual abuse is testimony from the victim, the case necessarily 'turn[s] on the credibility of the victim.' " *State v. Clark*, 380 N.C. 204, 213 (2022) (alteration in original) (quoting *State v. Towe*, 366 N.C. 56, 63 (2012)). In *Clark*, the disputed testimony related to the victim's credibility; here, the disputed testimony relates to the defendant's credibility. But in both instances, the legal issue is the same and the legal analysis should be applied in the same way. This is not in any way to

diminish the severity of the offense at issue here or to ignore the implications of a new trial for the victim. Our task is to ensure that equal justice prevails, that trials are fair, and that verdicts are untainted by improper appeals to irrelevant considerations. *See, e.g.*, *State v. Cain*, 175 N.C. 825, 828 (1918) ("The object of a trial expressed in the oath of a juror to '[d]o equal and impartial justice between the State and the prisoner at the bar,' . . . to acquit the innocent and to convict the guilty.").

Based on our precedents, the 404(b) evidence in this case was improperly admitted and its introduction into evidence was plain error. Additionally, while Mr. Reber did not object to the prosecutor's remarks during closing arguments, those statements were based, in part, on the improperly admitted evidence and were "so grossly improper" that the trial court should have intervened *ex mero motu. See State v. Trull*, 349 N.C. 428, 451 (1998). By neglecting to intervene, the trial court failed to protect Mr. Reber's rights and the sanctity of the proceedings. *State v. Jones*, 355 N.C. 117, 133 (2002).

Accordingly, I dissent.

## I. Background

Mr. Reber and his one-year-old daughter moved to North Carolina in 2009 to live with Mr. Reber's grandparents. After moving to the state, Mr. Reber began working in a group home where he met K.W.'s parents, Troy and Sherry. He soon began hunting with Troy and became friends with the whole family, including Troy and Sherry's five children.

In October 2015, K.W. told her mother that Mr. Reber had been "messing with her." Sherry reported the allegations to the Ashe County Sheriff's Office, and K.W. was interviewed and received a medical exam. In the interview, K.W. disclosed that Mr. Reber had been touching her sexually since she was eight years old and that the first time was one night in the deer blind after the two had been hunting. K.W. alleged that Mr. Reber abused her in multiple locations over three years: the deer blind, K.W.'s couch, K.W.'s bedroom, the bathroom in K.W.'s home, Mr. Reber's bedroom, and in the woods and a smoking spot outside Mr. Reber's home. According to K.W., the abuse ended just before her eleventh birthday in April 2015.

K.W.'s medical exam produced no physical evidence that she had been sexually abused. And while K.W. told her mother that Mr. Reber had a mole near his pubic line, no mole was found upon examination of the area by the examining nurse and Detective Lewis. Furthermore, K.W.'s allegations that she and Mr. Reber sent nude photos on Snapchat were never corroborated. Police also never found any text messages between K.W. and Mr. Reber on Mr. Reber's phone or on K.W.'s tablet.

No witness, aside from K.W., testified to any inappropriate behavior between K.W. and Mr. Reber. K.W.'s mother testified that she trusted Mr. Reber to be alone with her daughter, and Mr. Reber's grandmother, Dorothy, disputed that any abuse could have occurred in her home. Dorothy explained that she was always home when K.W. was present and the door to Mr. Reber's room always remained open when K.W. was there. Moreover, although K.W. indicated that some of the abuse occurred one

morning while Mr. Reber's family was at church, Dorothy testified that this was not possible. Namely because on the day of the alleged incident, K.W. was at church with Mr. Reber's family and not home alone with Mr. Reber.

Moreover, Mr. Reber denied having any sexual contact with K.W. He testified that he only spent the night at Troy and Sherry's house when Troy invited him to and that on those nights, he slept on the couch where Troy stayed up late watching television. Mr. Reber also noted that even though he and K.W. sometimes hunted together at night, the two had never been alone in the deer blind.

## II.    Rule 404 of the North Carolina Rules of Evidence

Because the plain error standard is based, in part, on the prejudice a defendant suffers when evidence is improperly admitted, *State v. Lawrence*, 365 N.C. 506, 518 (2012), it is necessary to begin with a discussion of Rule 404(b) and a review of the Rule 404(b) evidence offered in Mr. Reber's case. *See* N.C.G.S. § 8C-1, Rule 404(b) (2023).

Under Rule 404, "[e]vidence of a person's character or a trait of his character is not admissible" to show that the person "acted in conformity therewith on a particular occasion." N.C.G.S. § 8C-1, Rule 404(a). However, evidence of a defendant's "other crimes, wrongs, or acts" may be "admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident." N.C.G.S. § 8C-1, Rule 404(b). In all cases however, the rule of relevancy applies, and the evidence sought to be introduced must be

"relevant to any fact or issue other than the character of the accused." *State v. Jones*, 322 N.C. 585, 588 (1988) (cleaned up). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (2023).

Any relevant evidence of a defendant's prior bad acts "must be closely scrutinized" because its introduction can "distract" the jury and "confuse their consideration of issues at trial." *Jones*, 322 N.C. at 588–89. Namely because "proof that a defendant has been guilty of another . . . equally heinous" act can prompt the jury to readily accept the "prosecution's theory that [the defendant] is guilty of the crime charged." *Id.* at 589 (cleaned up). The effect of this evidence "is to predispose the mind of the juror to believe the [defendant] is guilty, and thus effectually to strip him of the presumption of innocence." *Id.* (cleaned up).

Accordingly, Rule 404(b) evidence is "constrained by the requirements of similarity and temporal proximity." *State v. Al-Bayyinah*, 356 N.C. 150, 154 (2002); *see also State v. Boyd*, 321 N.C. 574, 577 (1988) ("[T]he ultimate test for determining whether such evidence is admissible is whether the incidents are sufficiently similar and not so remote in time as to be more probative than prejudicial . . . ."). We have said that a prior bad act or crime is sufficiently similar when there are "some unusual facts present in both crimes or particularly similar acts which would indicate that the same person committed both." *State v. Stager*, 329 N.C. 278, 304 (1991) (quoting *State*

*v. Green*, 321 N.C. 594, 603 (1988)). While these similarities do not need to "rise to the level of the unique and bizarre," *Green*, 321 N.C. at 604, the State must show a "common *modus operandi* or 'signature' " between the prior bad act and the crime charged, *State v. Scott*, 318 N.C. 237, 244 (1986).

In cases where an adult defendant is charged with sexually abusing a child and the State seeks to introduce evidence of the defendant's prior bad acts pursuant to Rule 404(b), our Court has required that there be a strong factual similarity between the prior bad act and the crime currently charged. For example, in *Scott*, the defendant had been charged with committing a first-degree sexual act, cunnilingus with his sister's two daughters, who were three and four years old at the time of the offense. *Id.* at 239. There, our Court determined that the evidence the State sought to introduce, alleged sexual contacts by defendant against his sister after threatening her with a knife when he was thirteen years old, was not sufficiently similar because it lacked a common "*modus operandi* or 'signature' " with the presently-charged crime. *Id.* at 244. Likewise, the Court of Appeals has also insisted on a high degree of similarity between a prior bad act and the currently charged crime in child sexual assault cases. *See State v. Doisey*, 138 N.C. App. 620, 626 (2000) (holding that evidence a defendant had recorded children in the bathroom was not admissible to prove the defendant had sexually assaulted his girlfriend's twelve-year-old daughter).

Rule 404(b)'s similarity requirement is particularly important when the prior bad act sought to be introduced involves sex acts with adults. The Court of Appeals

has repeatedly found that evidence of a defendant's sexual acts with other adults is inadmissible to prove child sexual abuse. *See, e.g.*, *State v. Davis*, 222 N.C. App. 562, 566–70 (2012) (finding that evidence the defendant had written a story about nonconsensual anal sex with an adult woman was not admissible to prove he had anal sex with a male child); *State v. Bush*, 164 N.C. App. 254, 260–62 (2004) (holding that evidence the defendant bought and owned pornography was not admissible to prove he sexually abused a female child); *State v. Dunston*, 161 N.C. App. 468, 473 (2003) (concluding that evidence that the defendant "engaged in and liked" anal sex with his wife was not admissible to prove he had anal sex with a female child).

The challenged evidence here includes certain text messages. The first text message exchange involved a conversation between Mr. Reber and Danielle, an adult, and relates to a prior sexual encounter between the two involving alcohol. The second text message exchange referenced Mr. Reber and Danielle's discussion of their plan to meet at a motel for sex and Mr. Reber's subsequent mention of asking his daughter not to share this plan with Mr. Reber's grandparents.

While these text messages discuss sexual acts, that is where the similarities between the crimes Mr. Reber was accused of and the text messages he exchanged with Danielle, an adult woman, end. The conduct K.W. alleges occurred over the span of three years and involved a child between the ages of eight and eleven. While the sexual act discussed in the first text message occurred after Danielle had been drinking, there is no evidence that Mr. Reber ever gave K.W. alcohol or that K.W.

was impaired during the alleged offenses. Moreover, although K.W. stated the alleged abuse had occurred in the deer blind and at her home, there is no evidence that Mr. Reber and Danielle ever had sex in those places. There is also no evidence Danielle and Mr. Reber exchanged nude photos, despite K.W. alleging that she and Mr. Reber had engaged in that act. Accordingly, there is nothing similar about the abuse K.W. alleged and the acts referenced in the wrongfully admitted text messages between Mr. Reber and Danielle.

Furthermore, during its closing argument, the State all but confessed that it wanted these text messages admitted for the impermissible purpose of character evidence. In closing, the State asked the jury: "Who is Joshua Reber?" The prosecutor then attacked Mr. Reber's character, describing him as someone whose first sexual encounter with Danielle "involved taking her boobs out of her shirt and having intercourse with her" when "she was too drunk to even remember it." Yet Rule 404 expressly forbids the introduction of evidence for this reason, stating that evidence of a prior bad act is not admissible to "prov[e] that [the defendant] acted in conformity therewith on a particular occasion." N.C.G.S. § 8C-1, Rule 404(a). Admission of this evidence allowed the jury to convict Mr. Reber based on the kind of person they think he is, "rather than because the evidence discloses, beyond a reasonable doubt, that he committed the offense charged." *Jones*, 322 N.C. at 590.

### III.  Door Opening

While the majority does not address whether Mr. Reber may have opened the

door to the challenged evidence by testifying regarding his relationship with Danielle because it assumes that admission of the challenged evidence was erroneous, I do not read the dissent in the Court of Appeals as narrowly as the majority does. *See State v. Reber*, 289 N.C. App. 66, 83 (2023) (Dillon, J., dissenting) ("Arguably, the questioning was not error, as the defense opened the door to the questioning by asking Defendant on direct about his relationship with this adult woman."). In my view, under our precedent, it was impermissible for the prosecutor to question Mr. Reber about the details of his sexual relationship with Danielle.

"Where one party introduces evidence as to a particular fact or transaction, the other party is entitled to introduce evidence in explanation or rebuttal thereof, even though such latter evidence would be incompetent or irrelevant had it been offered initially." *State v. Albert*, 303 N.C. 173, 177 (1981) (first citing *State v. Patterson*, 284 N.C. 190 (1973), then citing *State v. Black*, 230 N.C. 448 (1949)). However, while "[s]uch cross-examination is permissible," it cannot be used "to expose an entirely new line of inquiry otherwise impermissible under [our] Rules." *State v. Lynch*, 334 N.C. 402, 412 (1993). Instead, it can "*only*" be used "to correct inaccuracies or misleading omissions in the defendant's testimony or to dispel favorable inferences arising therefrom." *Id.* (emphasis added).

On direct examination, the evidence Mr. Reber offered was in response to the State's case-in-chief. First, K.W.'s testimony provided that she and Mr. Reber had exchanged nude photos through Snapchat. To establish that Mr. Reber was familiar

with Snapchat, the State introduced text messages between Danielle and Mr. Reber that discussed the Snapchat application. In response, and to establish who Danielle was and that he was not familiar with the Snapchat application, Mr. Reber testified that Danielle was an ex-girlfriend and that he was not familiar with Snapchat, nor did he use it to communicate with K.W.

Next, Mr. Reber's testimony regarding his sexual partners and condom use was also in direct response to the State's evidence. Namely, K.W.'s testimony that Mr. Reber did not use condoms and that he used the "pull-out" method of contraception during sex. On direct examination, and to rebut K.W.'s testimony, Mr. Reber testified that he frequently used condoms. While defense counsel asked Mr. Reber if he had adult sexual partners, this questioning was used to inquire about Mr. Reber's condom use in direct response to K.W.'s testimony. Additionally, Mr. Reber was entitled to offer that evidence to rebut K.W.'s allegation that he was attracted to and engaged in sexual acts with an underage girl.

In sum, the "particular fact[s] or transaction[s]," *see Albert*, 303 N.C. at 177, that Mr. Reber testified to on direct examination were (1) that he had adult girlfriends, and (2) that he regularly used condoms. His testimony did not recount the details of his sexual relationship with Danielle or any other adult woman. Mr. Reber also did not mention whether he and Danielle had sexual relations under the influence of alcohol or before they began dating. His direct examination testimony also did not discuss whether he and Danielle had difficulty finding a location for sex

or if they wanted to conceal their sexual relationship from Mr. Reber's grandparents. Importantly, Mr. Reber's testimony about having an adult girlfriend did not give the State carte blanche to ask about the details of Mr. Reber's sexual relationship with Danielle. This testimony was both irrelevant and inadmissible. *See* N.C.G.S. § 8C-1, Rule 401; N.C.G.S. § 8C-1, Rule 404.

## IV.    Plain Error Standard

Under Rule 10 of the North Carolina Rules of Appellate Procedure, "[i]n order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context." N.C. R. App. P. 10(a)(1). However, in cases where there are "plain errors or defects affecting substantial rights," these errors "may be noticed although they were not brought to the attention of the court." *State v. Odom*, 307 N.C. 655, 660 (1983) (cleaned up). While this standard "is normally limited to instructional and evidentiary error[s]" that are unpreserved, *Lawrence*, 365 N.C. at 516, "the term plain error" is not limited only to those errors that are "obvious or apparent," *Odom*, 307 N.C. at 660 (cleaned up).

This Court adopted the plain error standard in *Odom* and provided a comprehensive explanation of the rule's scope and purpose. There, this Court explained, that while the plain error standard's protections are only applicable in "exceptional" cases, where "it can be said . . . a fundamental error" has occurred, what

constitutes a fundamental error is broad and has been defined as: (1) "something so basic, so prejudicial, so lacking in its elements that justice cannot have been done"; or (2) "the error is grave error which amounts to a denial of a fundamental right of the accused"; or (3) "the error has resulted in" either "a miscarriage of justice or in the denial . . . of a fair trial" for the accused; or (4) the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings"; or (5) where "the instructional mistake had a probable impact on the jury's finding that the defendant was guilty." *Id.* (cleaned up) (quoting *United States v. McCaskill*, 676 F.2d 995, 1002 (4th Cir. 1982)).

Moreover, this standard cannot be applied in isolation and requires review of "the entire record" in a case. *Id.* (quoting *McCaskill*, 676 F.2d at 1002). This Court affirmed this and the above principles first in *State v. Black*, 308 N.C. 736, 740–41 (1983), and then again in *State v. Walker*, 316 N.C. 33, 39 (1986). This mandate exists, in part, because the question a reviewing court must answer is whether "the error . . . 'tilted the scales' and caused the jury to reach its verdict convicting the defendant." *Walker*, 316 N.C. at 39 (quoting *Black*, 308 N.C. at 741). Indeed, as both the *Black* and *Walker* Courts explained, the strength and volume of the evidence against the defendant plays a role in the plain error analysis.[1] *Black*, 308 N.C. at 741; *Walker*,

---

[1] It is important to note that while the majority cites *State v. Maddux*, 371 N.C. 558, 564 (2018), for the proposition that it is improper to consider "the strength of the State's evidence" when conducting a plain error analysis, *Maddux* does not state this. Instead, *Maddux* reiterates the directive in *Lawrence*, 365 N.C. at 519, which requires the reviewing

316 N.C. at 40; *see also Maddux*, 371 N.C. at 567; *see also Lawrence*, 365 N.C at 519.

Namely, when there is "overwhelming evidence against the defendant" it may

"prevent[ ] the error complained of from rising to the level of 'plain error.' " *Walker*,

316 N.C. at 40. Without examining the entire record, this analysis cannot be properly

achieved.

In *Lawrence*, this Court reaffirmed the "probable impact" standard from *Odom*,

*Black*, and *Walker*, stating that "a criminal defendant is entitled to a new trial if the

defendant demonstrates that the jury *probably* would have returned a different

verdict had the error not occurred." *Lawrence*, 365 N.C. at 507 (emphasis added). This

premise was reiterated again in *Maddux*, where this Court stated that a "[d]efendant

must demonstrate that absent the error, the jury probably would have reached a

different result." 371 N.C. at 565 (cleaned up). Thus, while the majority's

interpretation of the plain error standard in *Lawrence* makes it virtually impossible

to meet, that is not what this Court intended. Instead, because the term "different

result" includes a hung jury the real inquiry is whether absent the error, one juror

probably would have concluded that there is reasonable doubt as to any element of

the crime. *See id*. Because if one juror has reasonable doubt, the jury would be unable

to reach consensus and there would be a different result in the case. *See id*.

Moreover, while it is true that in *Lawrence*, this Court clarified the plain error

---

Court to consider whether the State has presented "overwhelming and uncontroverted evidence" against the defendant. *Id*.

standard, this Court also clearly stated it was "reaffirm[ing] [its] holding in *Odom*." *Lawrence*, 365 N.C at 518. In doing so, this Court quoted directly from the *Odom* opinion to explain that (1) "[f]or error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial"; (2) "[t]o show that an error was fundamental, a defendant must establish prejudice—that, after examination of the entire record, the error 'had a probable impact on the jury's finding that the defendant was guilty' "; and (3) "because plain error is to be 'applied cautiously and only in the exceptional case,' the error will often be one that 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' " *Id.* (third alteration in original) (quoting *Odom*, 307 N.C. at 660).

Later, in *State v. Towe,* 366 N.C. 56 (2012), *State v. Juarez*, 369 N.C. 351 (2016), and *Maddux*, 371 N.C. 558, this Court stated that it was following the standard first articulated in *Odom* and reaffirmed in *Lawrence*. In all three of these cases, this Court's opinions quote from and provide citations to the opinions in both *Lawrence* and *Odom*. The standard articulated in *Lawrence*, *Towe*, *Juarez*, and *Maddux*, while focusing in part on the "probable impact" of the error on the jury's finding that the defendant was guilty, also emphasizes the need to analyze an error to determine if a fundamental error exists, which is dependent on whether prejudice is established, and whether the error is one "that seriously affects the fairness, integrity or public reputation of judicial proceedings." *Lawrence*, 365 N.C. at 518 (cleaned up); *see Towe*, 366 N.C. at 62; *Juarez*, 369 N.C. at 358; *Maddux*, 371 N.C at

564. Moreover, in *Towe*, this Court provided additional context for applying the plain error standard. There, this Court stated it was "apply[ing] the test set out in *Lawrence* and *Odom*" and explained that as part of its plain error analysis, it must consider whether the erroneously admitted testimony in Mr. Towe's case "impermissibly bolstered the victim's credibility" such that it had "the prejudicial effect necessary to establish that the error was a fundamental error." *Towe*, 366 N.C. at 62–63 (cleaned up).

The majority evades the entirety of the plain error analysis, through a type of appellate gerrymandering, which slices and dices the issues this Court may review when an appeal is based on a dissent. This is based, in part, on the majority's narrow reading of the dissent as only addressing the "prejudice prong" of plain error review. This approach is a misapplication of this Court's decision in *Cryan v. Nat'l Council of YMCAs*, 384 N.C. 569 (2023). In *Cryan*, this Court reiterated the standard set out in Rule 16 of the North Carolina Rules of Appellate Procedure, which states that when an appeal is based solely upon a dissent in the Court of Appeals, review in this Court is "limited to a consideration of those *issues* that are . . . specifically set out in the dissenting opinion as the basis for that dissent." 384 N.C. at 574 (emphasis added) (quoting N.C. R. App. P. 16(b)).

In Mr. Reber's case, the dissent at the Court of Appeals included two issues: whether "the prosecution's cross examination of Defendant" and the admission of that "testimony" and the "prosecutor's statements during closing" were "error." *Reber*, 289

N.C. App. at 83 (Dillon, J., dissenting). Accordingly, those are the two *issues* before this Court. The directive that this Court only review the issues set out in the dissenting opinion does not mandate this Court to only consider one portion of the plain error standard while ignoring all others. Moreover, the plain error standard does not contain "prongs" that are as separate and distinct as the majority suggests. Instead, all three portions of this standard are interrelated.[2] The interrelatedness of the first two prongs is clearly articulated in *Lawrence*, which provides that

> [f]or error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial. To show that an error was fundamental, a defendant must establish prejudice—that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty.

*Lawrence*, 365 N.C. at 518 (cleaned up); *see also Maddux*, 371 N.C. at 564; *Juarez*, 369 N.C. at 358. Additionally, *Juarez* focused on the interrelatedness of the last two portions of the plain error test and admonished the Court of Appeals for "fail[ing] to analyze whether [the] error [in that case] had the type of prejudicial impact that seriously affected the fairness, integrity or public reputation of the judicial proceeding." 369 N.C. at 358 (cleaned up). Importantly, this Court explained that

---

[2] The majority mischaracterizes our plain error analysis as being a "holistic" test that disregards the plain error standard's three prongs. But what the majority fails to consider is that two things can be true. Namely, that the plain error standard is composed of three factors, and those three factors are interrelated. The majority suggests this premise sets forth a "new theory of plain error," but our precedent in *Lawrence*, *Maddux*, and *Juarez* shows the opposite is true. Indeed, our decisions in those cases exemplify the interrelatedness of the plain error test's three parts. *See Lawrence*, 365 N.C. at 518; *see also Maddux*, 371 N.C. at 564; *Juarez*, 369 N.C. at 358.

without answering this question, a plain error analysis is "insufficient." *Id*. Thus, on appeal, the proper review requires an analysis of the entire plain error standard.

The improperly admitted text messages in this case meet the plain error standard. Rule 404(b) evidence is inherently prejudicial because it tempts the jury to convict the defendant based on what they think of his character. *Jones*, 322 N.C. at 590. Put another way, the jury might convict the defendant because they believe he is the kind of person who would commit the charged offense and not because the State has proved the defendant committed the crime beyond a reasonable doubt. *Id*. The risk of this is even greater in cases like this one where there is no medical or physical evidence and no eyewitness to the alleged abuse and thus the jury is tasked with evaluating only the credibility and truthfulness of each witness. *See Kimbrell*, 320 N.C. at 767. Accordingly, the outcome of Mr. Reber's trial "depended [only] on the jury's perception of the relative veracity of the witnesses." *Id*.

The situations in both *Black* and *Walker* stand in stark contrast to Mr. Reber's case. In *Black*, the "[e]vidence presented by the State was very convincing," 308 N.C. at 741, while the evidence against the defendant in *Walker* was said to be "overwhelming," 316 N.C. at 40. Here, the evidence against Mr. Reber only consisted of the complaining witness's testimony and there was no medical or physical evidence to corroborate those statements. Even the majority admits this "was not a particularly strong case for the State."

Additionally, in its brief to this Court, the State argues that the jury believed

K.W.'s testimony over that of Mr. Reber's and that accordingly, the improperly admitted evidence cannot rise to the level of plain error. This argument overlooks the very reason 404(b) evidence is inherently prejudicial and ignores this Court's directive in *Towe*. Namely that when the alleged error challenges erroneously admitted testimony, the reviewing court must consider whether that testimony "impermissibly bolstered the victim's credibility" such that it had "the prejudicial effect necessary to establish that the error was a fundamental error." *Towe*, 366 N.C at 62–63 (cleaned up). This is especially pertinent in Mr. Reber's case, where the only evidence against him was the testimony of the complaining witness. Consequently, the introduction of Rule 404(b) evidence, which portrayed Mr. Reber as "a sexual deviant," *see State v. Maxwell*, 96 N.C. App. 19, 25 (1989), undoubtedly "impermissibly bolstered [K.W.'s] credibility," while simultaneously destroying Mr. Reber's, *see Towe,* 366 N.C. at 62-63. Taking all of this together, the admission of the improperly admitted Rule 404(b) evidence probably impacted the jury's finding that Mr. Reber was guilty and thus meets North Carolina's plain error standard. Accordingly, Mr. Reber should be granted a new trial. *See id.* at 64.

## V.       Prosecutor's Statements During Closing Arguments

In *State v. Jones*, this Court "[r]egrettably" expressed its concern regarding the growing number of claims alleging that improper arguments had occurred. 355 N.C. at 127. The Court also voiced a concern that "it appear[ed] . . . that some attorneys intentionally 'push the envelope' with their jury arguments in the belief that there

will be no consequences for doing so." *Id.* This is particularly concerning in criminal cases that involve the State's attorney, "whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Id.* at 130 (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). Thus, the United States Supreme Court has stated that while a prosecutor may "strike hard blows, he is not at liberty to strike foul ones." *Id.* (quoting *Berger*, 295 U.S. at 88). "If verdicts cannot be carried without appealing to prejudice or resorting to unwanted denunciation, they ought not to be carried at all." *State v. Tucker,* 190 N.C. 708, 714 (1925).

The State's responsibility to adhere to these mandates is a weighty one. Particularly because the "average jur[or] . . . has confidence that these obligations . . . will be faithfully observed." *State v. Smith*, 279 N.C. 163, 167 (1971) (quoting *Berger*, 295 U.S. at 88). Accordingly, "improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." *Id.* (quoting *Berger*, 295 U.S. at 88).

Similarly, trial judges have a responsibility as "overseers of our courts" to intervene when attorneys violate "courtroom protocol." *Jones*, 355 N.C. at 128 (citing *Couch v. Priv. Diagnostic Clinic*, 351 N.C. 92 (1999)). This is particularly true during closing arguments, where defense counsel may be reluctant to interrupt the State's closing remarks "for fear of incurring jury disfavor." *Id.* at 129. Moreover, intervention by the trial court becomes "especially proper" in cases where "the State is prosecuting one of its citizens" to ensure "the jury [will not be] unfairly prejudiced

against [the defendant]." *State v. Miller*, 271 N.C. 646, 659 (1967). Accordingly, during closing arguments the trial court must "monitor vigilantly" what is said and "intervene as warranted." *Jones*, 355 N.C. at 129.

In cases where an alleged improper closing argument is not followed by a timely objection, the correct standard of review asks, "whether the [remarks were] so grossly improper that the trial court erred in failing to intervene *ex mero motu*." *Trull*, 349 N.C. at 451. Stated differently, was the argument so improper that the trial court was required to intervene, stop the attorney from making "similar remarks," "and/or . . . instruct[ ] the jury to disregard the improper comments already made," "in order to protect the rights of the parties and the sanctity of the proceedings"? *Jones*, 355 N.C. at 133. In Mr. Reber's case, the answer to this question is, "yes."

To constitute reversible error, the prosecutor's statements must be "both improper and prejudicial." *Id*. A remark is improper if it is "calculated to lead the jury astray" and includes "references to matters outside the record and statements of personal opinion." *Id*. These statements are prejudicial "either because of individual stigma or because of the general tenor of the argument as a whole." *Id*.

In *Jones*, this Court reviewed a prosecutor's statements during closing arguments, which included name calling and were not objected to during trial. There, the prosecutor said the following about the defendant: "You got this quitter, this loser, this worthless piece of—who's mean. . . . He's as mean as they come. He's lower than the dirt on a snake's belly." *Id*. (alteration in original). This Court found that the

prosecutor's remarks "incorporated personal conclusions," which "amounted to little more than name calling," and accordingly, the prosecutor had "exceed[ed] the boundaries of proper argument." *Id.* at 133–34. Furthermore, this Court explained that the prosecutor's tactics during trial prejudiced the defendant "by improperly leading the jury to base its decision not on the evidence relat[ed] to the issues submitted, but on misleading characterizations, crafted by counsel, that [were] intended to undermine reason in favor of visceral appeal." *Id.* at 134.

Similarly in *Miller*, the prosecutor "defiled" the character of the defendants during closing. 271 N.C. at 657. There too, this Court reviewed statements that were not objected to at trial. *Id.* These remarks "inferred" that the defendants, who were charged with breaking and entering into a jewelry store, "were habitual store[ ] breakers," had broken into buildings prior to the incident they were charged with, and were "involved in a big[-]time business" *Id.* at 653, 657. None of these statements were supported by the record. *See id.* Because "[d]efendants in criminal prosecutions should be convicted upon the evidence in the case, and not upon prejudice" created by an "abus[ive] . . . solicitor," this Court granted a new trial. *Id.* at 657, 661; *see also Smith*, 279 N.C. at 165, 167 (holding that the prosecutor's statements during closing arguments, which referred to the defendant as "lower than the bone belly of a cur dog," were prejudicial and the trial judge who "failed to intervene on his own motion[ ] was derelict in his duty").

The prosecutor's statements in Mr. Reber's case are similar to those in *Jones*

and *Miller*; namely because the comments the prosecutor made relate to matters outside the record and are more properly characterized as the prosecutor's personal opinion. *See Jones*, 355 N.C. at 133. Like in *Jones*, the prosecutor in Mr. Reber's case made unsupported comments about the defendant's character. This included insinuations that Mr. Reber was the kind of man whose "first sexual encounter" with a woman would "involve[ ] taking her boobs out of her shirt and having intercourse with her . . . [when] she was too drunk to even remember it."

While the majority concludes that these statements were properly admitted evidence and thus, it was proper for the State to reference them during closing arguments, this conclusion is incorrect. First, as explained above, this evidence was not only improperly admitted, but its admission into evidence also meets the plain error standard and thus, should be excluded. Accordingly, this evidence must be disregarded and cannot be referenced during closing arguments. Moreover, the prosecutor's only reason for making these remarks was to persuade the jury to convict Mr. Reber based on what the jury thought of Mr. Reber's character and not because the State had proved that Mr. Reber committed the crime beyond a reasonable doubt. *See Jones*, 322 N.C. at 590. This deprived Mr. Reber of a fair and impartial trial. *See Miller*, 271 N.C. at 660–61.

Moreover, like in *Miller*, the prosecutor in Mr. Reber's case also made comments that were wholly extraneous to the record. Those remarks included references to Mr. Reber's condom use and sexually transmitted diseases. While it is

true that some of the improperly admitted evidence involved Mr. Reber's condom use, none of the evidence supported the prosecutor's claim that Mr. Reber contracted herpes, gonorrhea, syphilis, or AIDS. Accordingly, although the statements about Mr. Reber's condom use were improperly admitted, meet our plain error standard, and should be disregarded, the prosecutor also made statements that were not part of the record at all. These statements deprived Mr. Reber of a fair and impartial trial. *See id.*

"Arguments to a jury should be fair and based on the evidence or on that which may be properly inferred from the case." *Id.* at 659. In this case, "prejudice to the cause of the accused is so highly probable that we are not justified in assuming its non-existence." *Smith*, 279 N.C. at 166 (quoting *Berger*, 295 U.S. at 89). This prejudice is based on both "individual stigma" and "the general tenor of the argument as a whole," which sought to portray Mr. Reber as a sexual deviant. *See Jones*, 355 N.C. at 133. Because the remarks made by the prosecutor impaired Mr. Reber's right to a "fair and impartial trial," I would affirm the Court of Appeals' holding and grant Mr. Reber a new trial "where passion and prejudice and facts not in evidence have no part." *See Miller*, 271 N.C. at 660–61.

Lastly, while the majority suggests that an ineffective assistance of counsel (IAC) claim "will often be a better vehicle to raise these issues," that is a hollow and disingenuous promise. The opposite is true. *See* Eve Brensike Primus, *Structural Reform in Criminal Defense: Relocating Ineffective Assistance of Counsel Claims*, 92

Cornell L. Rev. 679, 680–81 (2007) [hereinafter *Ineffective Assistance of Counsel Claims*]. In many cases, even defendants with meritorious claims may experience serious delays in filing an IAC claim or be precluded from bringing their claim altogether. *Id*. For example, a defendant rarely is able to bring an IAC claim on direct appeal because the claim is not "apparent on the face of the record" and thus requires "further development of the facts." *See State v. Allen*, 360 N.C. 297, 316 (2006). This means that IAC claims will usually be brought by way of a motion for appropriate relief. By this stage in the proceedings, years may have passed between the defendant's conviction and the filing of their IAC claim, which makes it more difficult to find witnesses and gather evidence to support a claim. *See Ineffective Assistance of Counsel Claims* at 680. It is also not uncommon that a defendant has fully served their term of incarceration by the time a motion for appropriate relief can be filed. *Id*. at 680–81. Moreover, because there is no constitutional right to an attorney past a defendant's first appeal, many defendants are financially precluded from filing an IAC claim. *See id*. at 681; *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987).

Additionally, the legal standard required to show an IAC claim is challenging to meet. To succeed on an IAC claim, "the defendant must satisfy a two-part test" (the *Strickland* test). *State v. Banks*, 367 N.C. 652, 655 (2014) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth

> Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* (quoting *Strickland*, 466 U.S. at 687).

The first prong of the *Strickland* test requires a showing that the attorney's conduct "fell below an objective standard of reasonableness." *State v. Oglesby*, 382 N.C. 235, 243 (2022) (quoting *Strickland*, 466 U.S. at 688). Embedded within this test is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* (quoting *Strickland*, 466 U.S. at 689). Furthermore, this Court has explained that because "counsel is given wide latitude in matters of strategy," the defendant's "burden to show that counsel's performance fell short of the required standard is a heavy one for [the] defendant to bear." *State v. McNeill*, 371 N.C. 198, 218–19 (2018) (cleaned up).

The defendant must also show that "counsel's deficient performance prejudiced the defense." *Oglesby*, 382 N.C. at 246 (cleaned up). This requires the defendant to show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* (cleaned up). To prove prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

The majority's discussion regarding the strategic decisions Mr. Reber's counsel may have made, while based only on assumption, illustrates the difficulty of proving IAC claims. Namely, that it can be challenging for a reviewing Court to decipher if the conduct complained of was a tactical decision, where counsel has "wide latitude." *See id.* at 689; *see also State v. Fair*, 354 N.C. 131, 167 (2001) (holding that counsel's actions were "a matter of reasonable trial strategy"). While strict guidelines determining what might constitute "reasonable trial strategy," *see Fair*, 354 N.C. at 167, would be helpful to a reviewing Court, those guidelines "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions," *Strickland*, 466 U.S. at 689. Thus, while the majority focuses on the second prong of an IAC claim, the first prong, which requires a showing that "counsel's performance was deficient," *see Banks*, 367 N.C. at 655, is also a very hard prong to meet.

An IAC claim, even if available to a defendant, should not be a substitute for adjudicating claims involving prejudicial errors. Here, the circumstances of Mr. Reber's trial support that he suffered prejudice, both by the improperly admitted 404(b) evidence and the prosecutor's statements during closing. I would hold that (1) the improperly admitted 404(b) evidence meets our plain error standard, and (2) the prosecutor's challenged statements during closing "were so grossly improper" that the trial court should have intervened *ex mero motu*. Accordingly, under North Carolina law, Mr. Reber is entitled to a new trial.

Justice RIGGS joins in this dissenting opinion.