IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA 25-405

Filed 3 December 2025

McDowell County, Nos. 22CR304386-580, 22CR304394-580, 23CR000067-580

STATE OF NORTH CAROLINA

v.

TIMOTHY ALLEN MITCHELL

Appeal by defendant from judgment entered 28 May 2024 by Judge Reggie E. McKnight in McDowell County Superior Court. Heard in the Court of Appeals 15 October 2025.

> *Attorney General Jeff Jackson, by Special Deputy Attorney General Stuart M. Saunders, for the State.*

> *Appellate Defender Glenn Gerding, by Assistant Appellate Defender Mary McCullers Reece, for defendant.*

ARROWOOD, Judge.

Timothy Allen Mitchell ("defendant") appeals from judgment entered after trial by jury on five drug- and firearm-related convictions. Defendant contends that the trial court erred by denying his motion to suppress statements he made to law enforcement after his arrest because he had not first been informed of his constitutional rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). Defendant also contends that the trial court erred by denying his motion to dismiss the charges against him where the evidence was insufficient to submit the case to the jury.

I.     Background

A.     The Events of 25 September 2022

Chet Saylor owns a 60-acre farm in Marion and lives in the property's main farmhouse, located at 2294 Mud Cut Road.  Defendant lived as Mr. Saylor's tenant in a double wide trailer with his dog on the opposite side of the property, at 2290 Mud Cut Road, accessible by a separate driveway.  There is conflicting evidence as to the extent of defendant's work responsibilities on the property, which did not have an active farming operation.

Mr. Saylor has a long criminal record, including larcenies and drug charges.  On 30 August 2022, he was arrested on a warrant in Burke County and remained in custody until 25 September 2022.  Mr. Saylor testified that he was on probation and not keeping contraband in the house at the time of his arrest, though officers testified that his home was under surveillance at the time for suspected drug activity.[1]  He also testified that several people were staying on the property with his permission at the time of his arrest.  Nevertheless, he claimed to have learned from his family that defendant moved into the farmhouse while he was in jail, and that he had become concerned about ongoing criminal activity at the property in his absence, which would affect his probation status.

On 25 September 2022, upon his release from jail, Mr. Saylor went directly to

---

[1] All testimony discussed in this section was given in the State's case-in-chief.

the home of his friend Walter Taylor. He testified that he asked Mr. Taylor to carry a message to the property, ordering the defendant to get everyone out of the house, including himself. That evening, Mr. Taylor sent a group of four relatives to the property, including two juveniles. When they arrived, a man drove to the gate at Mud Cut Road and 16-year-old Amy Cowart exited the car to hand him the message. Ms. Cowart testified that this man was not the defendant and was able to describe his appearance. She and her aunt April Thomas both testified that when Ms. Cowart asked him to deliver their note to defendant, the man pulled a gun on them and chased them away from the property in his vehicle.

After they returned to Mr. Taylor's home, Mr. Saylor called local police to report the incident and, according to three officers' testimony, gave them permission to enter the farmhouse and remove its inhabitants. Deputy Alicia Lund and Deputy Christopher Dvorak arrived at the property in separate patrol cars at about 8:45 p.m. Officer Lund testified that she was familiar with the property, had been on the premises before, and understood that its owner had consented to their entering the property. Both officers testified that they knocked on the home's sliding glass door, where they saw defendant sitting in an armchair and two women, Hayley Johnson and Candace Smith, sitting nearby. Both officers testified that he invited the officers into the large living room, where they instantly saw copious drug paraphernalia in plain view on surfaces throughout, describing empty cellophane baggies, aluminum foil, burnt spoons, loaded and unloaded needles, and bottles of Narcan. Officer Lund

testified that she was familiar with all three individuals and was aware that defendant was a convicted felon. The officers collected the three individuals' information to check for warrants.

At this time, the three inhabitants were still free to move around the living room, and both officers testified that at one point, defendant got up from the chair to get a drink, and Officer Dvorak testified that because of the report of the gun, they were watching him carefully. Both officers testified that defendant denied knowing anything about the earlier firearm incident and made two further statements: that he had permission to be present in the house, and that he was supposed to keep people out of the house. Officer Lund testified that the women said they were "just visiting."

The officers received communication that defendant had an active warrant, and they immediately told him to stand up from the armchair and handcuffed him, hands in front. Both officers testified that they noticed for the first time a plastic bag, which they believed to contain methamphetamine, in the seat of the armchair where he had been sitting. Due to the officers' relative inexperience and the amount of drug paraphernalia, Officer Lund decided to call Lieutenant Kirk Hensley for back-up. After the arrest, while waiting several minutes for Lt. Hensley to arrive on the scene, neither officer gave defendant *Miranda* warnings.

Thereafter, Lt. Hensley arrived at the property and saw the two patrol cars and defendant's pick-up truck. He testified that the officers informed him that defendant had said he had permission to be there, and that he immediately

- 4 -

recognized all three individuals upon entering the living room. Lt. Hensley testified that he then asked all three individuals, "Who lives here?" According to his testimony, defendant responded that he lived there, that he had written permission to stay in the house, and that the written permission was in the master bedroom. All three officers testified that he then led Lt. Hensley into the master bedroom, where he briefly looked for it but did not see it. Lt. Hensley testified that defendant said that this was the bedroom where he stays, and that he uses the facilities in the attached master bathroom. He testified that the room was "well lived in" and extremely messy "like a Hoarders TV show," strewn with male clothing, with an open box of shotgun shells on the bed and a tablet screen turned on atop a corner shelf.

At this point, Lt. Hensley decided to freeze until he had written consent from Mr. Saylor to fully search the house. Mr. Saylor arrived at the property, signed a written consent form, and according to Lt. Hensley, expressed concern that he would get in trouble for the "stuff" found in the house. With written permission secured, Lt. Hensley testified that he returned to the bedroom and quickly found, under the bed, a black bag containing two bundles of white powder substance, which he believed to be fentanyl. In the adjoining bathroom, Lt. Hensley testified that they discovered a shotgun partially hidden behind a bookcase. This was not the weapon used during the earlier assault on Ms. Cowart. The officers seized the shotgun and the bags containing suspected contraband. Neither Ms. Johnson nor Ms. Smith was arrested, but Ms. Johnson was permitted to take defendant's dog and the pick-up truck, which

had been in defendant's possession.

Although all officers testified that they saw no one else on the property, the CAD report names two other individuals who were apparently present: Sandra Labonte and Brian Russell. Mr. Saylor also confirmed on redirect that another individual, T.J. Bowman, had been on the property at or around this time.

Lt. Hensley decided not to test the shotgun for fingerprints, both because he had already formed the opinion that it was possessed by defendant, and because it was not the gun used in the earlier incident. Officer Dvorak testified that the reason he believed defendant possessed the shotgun and the items discovered in the bedroom was because of defendant's statements to Lt. Hensley. Defendant was charged with possession of a firearm by a felon, trafficking opium or heroin, possession with intent to sell and deliver a Schedule II controlled substance, maintaining a dwelling place for controlled substance, and possession with intent to sell and deliver methamphetamine.

B.  Pretrial Hearing on Defendant's Motions to Suppress

The case was heard at trial by jury before the Honorable Reggie E. McKnight beginning 22 May 2024. Defendant filed motions to suppress his statements and evidence obtained without a search warrant.

At the pretrial hearing, Lt. Hensley and Officers Lund and Dvorak testified as witnesses for the State. All testified that they knew the residence belonged to Mr. Saylor and understood that Mr. Saylor had given them verbal consent to enter the

residence: Lund and Dvorak testified that defendant had invited them inside, where they saw drug paraphernalia in plain view. Furthermore, the State introduced Mr. Saylor's written consent, which the officers obtained before the thorough search of the residence was conducted. The court found that the officer seized the items pursuant to valid consent, overruling defendant's objection to the introduction of the tangible evidence.

In support of the admission of the statements defendant made to Lt. Hensley, the State conceded that defendant was in custody when Lt. Hensley asked, "Who lives here?" but argued that the question did not constitute interrogation. According to the State, Lt. Hensley "merely asked [defendant] to further explain the statement he had voluntarily given" earlier: his assertion that he had permission to be in the house. Therefore, Lt. Hensley did not "[intend] to elicit an inculpatory response." For this reasoning, the State relied upon *State v. Porter*, 303 N.C. 680 (1981), in which our Supreme Court held: "An officer's request in the heat of an emotional situation that the accused explain or clarify a volunteered statement is not a procedure designed to elicit an inculpatory response," and therefore not an interrogation within the meaning of *Miranda. Id.* at 692–93. The trial court agreed with the State and found that defendant's rights under state and federal law were not violated, overruling defendant's motion.

Defendant's custodial statements were introduced at trial. Defendant moved to dismiss for insufficient evidence at the close of the State's evidence and again at

the close of all evidence, which was denied by the trial court. Defendant was found guilty on all counts, sentenced to a minimum term of 225 months, and fined $500,000.00. Defendant entered notice of appeal in open court.

## II.    Discussion

On appeal, defendant first argues that the trial court erred when it overruled his motion to suppress his post-arrest statements. Defendant also argues that the trial court erred by denying his motions to dismiss the charges for insufficiency of the evidence. For the following reasons, we conclude that the trial court erred when it introduced defendant's statements to Lt. Hensley. Furthermore, we conclude that absent those statements' introduction, the State's evidence would have been insufficient as to most of the charges, and the trial court would have been obligated to grant defendant's motion to dismiss them. However, because defendant's counsel failed to object to their introduction at trial, we are required to review for plain error, a threshold defendant is unable to reach.

### A.    Defendant's Motion to Suppress

In *Miranda,* the United States Supreme Court held that:

> [T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.... Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.

- 8 -

*Miranda v. Arizona*, 384 U.S. 436, 444 (1966). In the present case, there is no dispute that defendant was in custody and had not been apprised of his *Miranda* rights at the time of his inculpatory statements. Thus, the dispositive issue is whether Lt. Hensley's question constituted interrogation. We conclude that it did, and therefore, admission of defendant's responsive statements was erroneous.

"The Supreme Court has defined the term 'interrogation' as follows: 'Any words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect.' " *State v. Brewington*, 352 N.C. 489, 503 (2000) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). The State is correct that *Porter* is relevant to our inquiry, insofar as it excludes from the definition of interrogation "an officer's request in the heat of an emotional situation that the accused explain or clarify a volunteered statement." *Porter*, 303 N.C. at 686. In that case, the defendant was in custody when a nearby officer contacted his supervisor via radio to tell him that two suspects had been apprehended. *Id.* at 691. The defendant had not yet been advised of his Miranda rights. *Id.* The supervisor asked if the officer found a bank bag, and defendant, overhearing the question, said the bag was "in the car." *Id.* The nearby officer immediately responded, "What bank bag?" and defendant replied, "The bag from the robbery." *Id.* These statements were introduced at trial, and on appeal, our Supreme Court found that the officer's question was a request to explain the preceding volunteered statement, and "an

immediate response in an emotional situation, made before [he] had the opportunity to form a design or motivation to elicit incriminating statements." *Id.*

We have applied this reasoning in subsequent cases. In *State v. Earwood*, 155 N.C. App. 698 (2003), a defendant shot himself and sought out police, and responding to initial questions by officers and again in an ambulance, the record showed that defendant "spontaneously and voluntarily" told them he had killed his mother. *Id.* at 703. We cited *Porter* and held that "even if defendant had been in custody," officers had asked him to clarify volunteered spontaneous utterances, which did not constitute interrogation. *Id.*

We later came to a different conclusion in an instructive unpublished case, *State v. Wright*, 184 N.C. App. 380 (2007). In that case, while several officers arrested defendant during a controlled purchase operation outside his home, one officer asked the unwarned defendant whether "there [was] anything else in the residence that we needed to know about." *Id.* Defendant said there was "some stuff" still in the house and said he would show them. *Id.* The defendant brought officers inside his bedroom, and a second officer asked, "Where's it at?" *Id.* Defendant "nodded with his forehead to the closet door" and stated, "the last coat." *Id.* The second officer asked, "[Is] that it?" and defendant stated, "there [are] some scales in a gym bag." *Id.* In both the coat and the bag, the officers found contraband. *Id.* Defendant challenged the introduction of the statements made inside the bedroom. *Id.* In our analysis, we noted that the second officer's questions were "at least several minutes after

defendant was taken into custody outside the residence" and thus not "a request in the heat of an emotional situation," that the defendant's questions were "a clear response to the officer's inquiries inside the residence…for the purpose of eliciting an incriminating response in that they sought information…about the whereabouts of additional contraband," and that the defendant's initial statements had been in response to questioning and not "spontaneous volunteered statements like those in *Porter* and *Earwood.*" *Id.* Thus, we determined that the trial court's admission of the statements constituted constitutional error. *Id.*

Though this case is not on all fours with the facts of *Wright*, both clearly present a different set of factual circumstances from the interaction in *Porter*. Analyzing the record, it is clear that Lt. Hensley's question was neither a request to clarify the earlier statements in the heat of an emotional situation, nor a question for a purpose other than eliciting an incriminating response.

Here, before he was in custody and while still free to move around the home, defendant volunteered to Officers Lund and Dvorak that he had permission to be in the home. Several minutes later, Lt. Hensley arrived at the home, which he knew belonged to Mr. Saylor. He then heard from the officers that defendant claimed permission there and observed the vast supply of drug paraphernalia in plain view throughout the home.

Importantly, several minutes had already passed because the officers had "froze[n]" while waiting for Lt. Hensley. The officers' own testimony shows they saw

no overriding or urgent need for defendant to explain his volunteered statement once he was in handcuffs, despite the unlocated gun. Furthermore, in the pretrial hearing, the trial court received several arguments from the State justifying admission of the challenged statements, including the public safety exception to *Miranda* due to the officers' concern about the firearm. The court quickly dismissed this argument, reasoning that the women present were both under the influence and posed no threat, defendant was already in custody, and "at least three law enforcement officers" were present.

Crucially, Lt. Hensley must have known the question "Who lives here?" was likely to invite an incriminating response. Consider the circumstances at that moment. Lt. Hensley, knowing that Mr. Saylor was the home's permanent resident, entered the home and saw in plain view a plethora of syringes, Narcan bottles, and empty baggies, which he described in great detail. Immediately, any experienced officer would know that any person "living" in such a home at that moment, in its owner's absence, would likely be responsible for dangerous illegal drug activity, irrespective of whether he had the owner's "permission" to be there. Nevertheless, he addressed all present, including a suspect he could see was already in custody, to ask who was living there. Any affirmative disclosure in response to this question would be seriously incriminating.

Furthermore, "Who lives here?" is not a logically apt or permissible follow-up question that would have effectively clarified defendant's volunteered statement.

*Porter* is highly instructive here. "What bag?" is an inherently and obviously clarifying simple question, immediately responsive to Porter's volunteered statement, "The bag is in the car." In the present context, clarifying questions to defendant's volunteered statement may have been, for example, "Who gave you permission?" or "When did you get permission?" or "Permission to be *inside* the house?" or even "Written permission or verbal permission?" By comparison, asking "Who lives here?" was a non-sequitur, unrelated to defendant's statement, and unhelpful to understand it. The inherent responsiveness and direct continuity of "What bag?" is nowhere to be found in these facts. Indeed, determining whether a person *lives* in a house is a wholly different inquiry from determining whether a person has *permission* to be there.

Lastly, and crucially, Lt. Hensley was not even on the scene when the defendant made volunteered statements, which places the case at bar at a significant removal from the circumstances of *Porter* and *Earwood*, where officers made "an *immediate response* in an emotional situation . . . before [they] had the opportunity to form a design or motivation to elicit incriminating statements." *Porter*, 303 N.C. at 691 (emphasis added).

In sum, we cannot agree with the trial court that the question was intended to clarify defendant's prior volunteered statement, because no competent facts in the record adequately support this conclusion. Therefore, Lt. Hensley's question arose pursuant to custodial interrogation, and the erroneous introduction of defendant's

responses was a clear violation of his fundamental constitutional protection against self-incrimination.

### B.  For Some Charges, the State's Evidence Would Have Been Insufficient Without Defendant's Coerced Statements

Before moving on to consider whether defendant has met the standard for plain error, it is worthwhile considering whether the State could have properly proceeded with its prosecution without this erroneous admission.  Here, not all the charges against defendant would have been affected by their exclusion.  However, careful review of the full record, as well as the State's appellate brief, reveals that this prosecution would have fallen short of its burden of proof on several of its charges had the trial court properly excluded these statements.

Defendant's counsel preserved the issue of sufficiency of the evidence by making and renewing a motion to dismiss that the trail court denied.  *State v. Golder,* 374 N.C. 238, 246 (2020).  In evaluating the issue *de novo*, the reviewing court examines the evidence in the light most favorable to the State, giving the State all reasonable inferences.  *State v. Fritsch*, 351 N.C. 373 (2000).  We ask whether substantial evidence supported every element of the offense and that defendant committed the offense.  *State v. Jones*, 110 N.C. App. 169, 177 (1993), *disc. review denied*, 336 N.C. 612 (1994).  Evidence is substantial if reasonable mind might accept it as adequate to form a conclusion.  *State v. Smith*, 300 N.C. 71, 78–79 (1980).  "If, however, when the evidence is so considered, it is sufficient only to raise a suspicion

or conjecture as to either the commission of the offense or the identity of the defendant as the perpetrator, the motion to dismiss must be allowed. This is true even when the suspicion aroused by the evidence is strong." *State v. Malloy*, 309 N.C. 176, 179 (1983) (citations omitted).

The charges against defendant fell into two categories: first, the possession of various contraband, and second, keeping or maintaining a dwelling for sale of illegal drugs. Because the possession charges here required application of the same rules, we will briefly consider them here first. It is uncontested that defendant lacked actual physical possession of any of the contraband in this case, so the State was required to prove defendant's constructive possession. *State v. Chekanow*, 370 N.C. 488, 492 (2018) (citation omitted). This occurs where a person lacking actual physical possession nevertheless has, considering the totality of the circumstances, "the intent and capability to maintain control" over the contraband. *State v. Givens*, 95 N.C. App. 72, 76 (1989) (quotes omitted). However, where possession of the premises is nonexclusive, as here, other incriminating circumstances are required. *State v. Brown*, 310 N.C. 563, 569 (1984) (citation omitted). Therefore, the court must consider the following factors: (1) defendant's ownership and occupation of the property, (2) defendant's proximity to the contraband, (3) indicia of defendant's control over the place where the contraband is found, (4) defendant's suspicious behavior at or near the time of its discovery, and (5) other evidence found in his possession linking him to the contraband. *Id.* at 496 (citations omitted). The most

frequently considered factors are his proximity to and the indicia of control over the place where the contraband is found. *State v. Miller*, 363 N.C. 96, 100 (2009).

With or without the incriminating statements, the State presented sufficient evidence that defendant constructively possessed the bag of methamphetamine found in the chair. Officer Lund and Dvorak both testified that defendant was seated in an armchair when they arrived, that no other person sat in that chair between their arrival and the arrest, and that they discovered that defendant had been sitting on the bag when he stood up to be handcuffed. Although defendant argues that there was no evidence as to defendant's awareness of the bag or whether it was on the chair before he entered the home, the officers' testimony was fully sufficient to show defendant's proximity and control over it, as compared to other parties who had access to the property. Further, because the officers discovered the bag before the defendant made unwarned statements, the trial court's error would have had no effect on the State's evidence on this charge.

For the fentanyl discovered in the bedroom and the firearm in the bathroom, the same result does not follow. On appeal, the State points to only three pieces of evidence from its case-in-chief showing defendant's constructive possession of these exhibits: (1) defendant's statement to Lt. Hensley that he lived in the farmhouse and had written permission to be there; (2) his familiarity with the bedroom when he accompanied Lt. Hensley there to look for the permission; and (3) the presence of men's clothes, which Mr. Saylor testified belonged to defendant. Absent the trial

court's error, the first two would have been properly excluded. Further, on cross, Mr. Saylor admitted that the clothes in the bedroom included articles defendant had given to him before his jail time. The State's case-in-chief also included testimony from four different witnesses that defendant was not the only male present at and having access to the property on the evening in question. Lastly, the jury heard from both Officer Dvorak and Lt. Hensley that the inadmissible statements established the basis for their belief that he possessed both the fentanyl and the firearm.

Thus, the constitutionally admissible evidence establishes the following: that defendant was in the home, claimed he had permission to be present, and was sitting on a bag of methamphetamine at the time of his arrest; that there was male clothing in the bedroom where the other contraband was discovered, the ownership of which was in controversy; that the home was strewn with a large amount of drug paraphernalia; that two other individuals who appeared under the influence of drugs were present in the home when officers arrived; and that at least two other males (Mr. Bowman and Mr. Russell) were on the property on the evening in question.

Viewed in the light most favorable to the State and affording it all reasonable inferences, this evidence is indeed sufficient to raise a reasonable "suspicion or conjecture" that defendant constructively possessed the contraband. *Malloy*, 309 N.C. at 179. However, without admission of his statements to Lt. Hensley that he stayed in the master bedroom, used its bathroom, and kept his written permission there, the State would have fallen impermissibly short of its burden to prove the

"identity of the defendant as the perpetrator," as opposed to the other males present that evening. *Id.*

As to the State's burden to prove defendant maintained a dwelling to sell controlled substances, the same conclusion follows. The question whether a person keeps or maintains a dwelling is a multi-factor analysis, considering: ownership of the property, occupancy of the property, repairs to the property, payment of taxes, payment of utility expenses, payment of repair expenses, and payment of rent. *State v. Bowens*, 140 N.C. App. 217, 221–23 (2000). Mere occupancy of a property is insufficient, but "evidence of residency, standing alone, is sufficient to support the element of maintaining." *State v. Moore*, 188 N.C. App. 416, 424 (2008). In *Moore*, defendant "used, treated, and perceived the dwelling as his residence and not merely as a place he occupied . . . from time to time." *Id*. at 424. By comparison, in *Bowens*, there was no evidence that the defendant owned or leased the dwelling or had any responsibility for its upkeep or utility payments; testimony that he was present in the dwelling on multiple occasions, as well as testimony that an officer believed he lived there, did not support the conclusion that he kept or maintained it. *Bowens*, 140 N.C. App. at 221–22.

Here, the State introduced no evidence that defendant owned, leased, or made any payments for upkeep or services at the farmhouse. Its owner, Mr. Saylor, testified in the State's case-in-chief that defendant leased the doublewide trailer across the property and had some responsibilities for the upkeep of the surrounding

area. But other than the clothing, the only evidence which, viewed in the light most favorable to the State and giving it all reasonable inferences, tended to show that defendant treated the house as his present residency, rather than somewhere he had permission to go, was contained in defendant's inculpatory inadmissible statements. Indeed, these are the only pieces of evidence on which the State relies on appeal.

Accordingly, absent the inadmissible statements, the State's evidence would have again fallen short of the minimum standard required to survive defendant's motion to dismiss. Therefore, the trial court would have been obligated to grant defendant's motion to dismiss as to all charges other than possession of methamphetamine.

## C. Plain Error

However, because defendant's counsel failed to object at trial when his statements were admitted, this is not the end of our analysis. Because of counsel's failure to object, we are limited to reviewing the erroneous admission of defendant's statements for plain error. N.C. R. App. P. 10(a)(4). Here, defendant must first show that a fundamental and "grave" error occurred at trial, amounting to "a denial of a fundamental right of the accused." *State v. Odom*, 307 N.C. 655, 660 (1983) (citation omitted). Defendant then must show both that the error "had a probable impact on the outcome, meaning that absent the error, the jury probably would have returned a different verdict" and that the "error is an exceptional case," requiring a showing that it "seriously affects the fairness, integrity, or public reputation of judicial

proceedings." *State v. Reber*, 386 N.C. 153, 158 (2024) (citations and quotation marks omitted).

As to the probable impact of the error, this Court's review requires defendant to meet an extremely high bar. "The test examines the state of all the evidence except for the challenged evidence and asks whether, in light of that remaining evidence, the jury probably would have done something different." *Id.* at 162. "In ordinary English usage, an event will "probably" occur if it is "almost certainly" the expected outcome; it is treated as synonymous with words such as "presumably" and "doubtless." " *Id.* at 158. "A close case is not enough to prevail on the prejudice prong of plain error." *Id* at 162. Circumstantial evidence may be sufficient to support a conviction even when "the evidence does not rule out every hypothesis of innocence." *State v. Maddux*, 371 N.C. 558, 566 (2018) (quotes omitted).

As already discussed, because the State did not rely on defendant's erroneously introduced statements to prove that defendant constructively possessed the methamphetamine, defendant cannot meet his burden to show that the jury would have returned a different result on that charge. However, the State's other evidentiary burdens present closer cases, and defendant must show, not that the State's constitutionally admissible evidence was insufficient, but that we can be certain that absent the error the jury would have "almost certainly" and "doubtless" returned a different result. *Reber*, 386 N.C. at 158. Despite the circumstantial nature

of all the State's remaining evidence, defendant does not meet this near-insurmountable burden.

Our earlier finding that the remaining evidence would have been insufficient to survive a motion to dismiss is relevant here, but it only leads us to the conclusion that the jury *very plausibly,* or even *very likely*, would have reached a different verdict. Again, the State's admissible evidence was "sufficient only to raise a suspicion or conjecture as to . . . the identity of the defendant as the perpetrator." *Malloy*, 309 N.C. at 179. But even this conclusion is below the plain error threshold. The remaining evidence provided a framework, however shaky, within which a reasonable jury could have spun the coarse web of conjecture necessary to convict defendant, relying in part on its observation of his credibility. Our conclusion is bolstered by the fact of the owner's testimony, that it was defendant and not he who was responsible for the presence of the contraband, and the lack of any evidence that police had seen suspicious evidence of drug use and dealing behavior while surveilling the house before the owner was taken into custody. Therefore, despite the State's insufficient and circumstantial evidence, defendant falls short of the plain error standard by a hair's breadth.

The other two prongs of this analysis are easily addressed. A defendant's right against compelled self-incrimination is enshrined in both the United States Constitution and the Constitution of the State and is therefore integral to criminal due process. Violation of this fundamental right affects the fairness, integrity, or

public reputation of judicial proceedings, because "it is the state judiciary that has the responsibility to protect the state constitutional rights of the citizens; this obligation to protect the fundamental rights of individuals is as old as the State." *Corum v. Univ. of N.C.*, 330 N.C. 761, 783 (1992) (citing *King v. South Jersey Nat. Bank,* 66 N.J. 161 (1974)).

Nevertheless, because defendant's attorney did not object to the erroneous and unconstitutional introduction of these statements at trial, defendant is bound by the plain error standard on appeal, which he cannot meet.

### D.    Defendant's Motion to Dismiss

Following the above conclusions on the evidence and defendant's motion to suppress, we return to defendant's motion to dismiss.

We review a trial court's denial of a motion to dismiss for insufficient evidence de novo.  *State v. Smith*, 186 N.C. App. 57, 62 (2007).  Denial of a motion to dismiss in a criminal trial is proper if there is substantial evidence of the essential elements of the offense and that the defendant was the perpetrator. *Fritsch*, 351 N.C. at 378. "In making its determination, the trial court must consider all evidence admitted, whether competent or incompetent, in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving any contradictions in its favor." *State v. Teague*, 286 N.C. App. 160, 181–82 (2022) (citation omitted), *writ denied, review denied,* 891 S.E.2d 281 (N.C. 2023).

Viewing all the evidence in the light most favorable to the State, we find the State presented sufficient evidence to withstand defendant's motion to dismiss on each of the charges.

III.    Conclusion

For the foregoing reasons, we find no error with respect to defendant's conviction for possession of methamphetamine and no plain error with respect to the remaining charges.

NO ERROR; NO PLAIN ERROR.

Judges TYSON and ZACHARY concur.